725 F.Supp. 712 (1989)
In re GULF OIL/CITIES SERVICE TENDER OFFER LITIGATION.
W. ALTON JONES FOUNDATION, Wenonah Development Company, Foster and Foster, and Foster Bam and Alma Foster Davis, Both Individually and as Trustees for Four Testamentary Trusts Under the Wills of Fannie Estelle Foster, Millicent F. Foster, Sylvester M. Foster, and Warren W. Foster, Plaintiffs,
v.
CHEVRON U.S.A. INC., f/k/a Gulf Oil Corporation, Defendant.
Master File No. 82 Civ. 5253 (MBM). 87 Civ. 8982 (MBM).
United States District Court, S.D. New York.
October 30, 1989.
*713 *714 *715 *716 *717 Stephen D. Oestreich, Wolf, Popper, Ross, Wolf & Jones, New York City, Berger & Montague, Philadelphia, Pa., Bizar D'Alessandro Shustak & Martin, Goodkind, Labaton & Rudoff, Kaufman, Malchman, Kaufman & Kirby, Lowey, Dannenberg & Knapp, P.C., New York City, for class action plaintiffs.
Thomas H. Moreland, Jeffrey S. Trachtman, Ross N. Herman, Paul F. Occhiogrosso, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Alton Jones plaintiffs.
John W. Castles III, Banks Brown, Frederic W. Parnon, John D. Henderson, Robert A. Becker, Lord Day & Lord, Barrett Smith, New York City, John S. Athens, Conner & Winters, Tulsa, Okl., John E. Bailey, Chevron U.S.A., Inc., Houston, Tex., William P. Casella, Narrowsburg, N.Y., for defendants.

SECOND AMENDED OPINION AND ORDER
MUKASEY, District Judge.
This litigation arises out of an abortive June 1982 tender offer by Gulf Oil Company ("Gulf") for the stock of Cities Service Company ("Cities"). The defendants are Gulf, a Pennsylvania corporation engaged in oil and gas exploration, production and marketing, GOC Acquisition, a wholly-owned Delaware subsidiary of Gulf created *718 to implement the tender offer for Cities, and various individuals, all directors and/or officers of Gulf at the time of the tender offer. In 1984, Chevron Corporation, parent of defendant Chevron U.S.A. Inc., acquired Gulf Corporation, parent of Gulf Oil Corporation. At the time of the tender offer, Cities was a Delaware corporation with its headquarters in Oklahoma. Cities ultimately became a wholly-owned subsidiary of Occidental Petroleum Corp. on December 3, 1982.
In an opinion dated September 23, 1986, as amended in an order providing for notice to the class, Judge Kram certified a class consisting of
All persons or entities who during the period June 17, 1982 to and including August 7, 1982: (1) tendered shares of Cities Service Company ("Cities Service") common stock to ... Gulf Oil Corporation ... pursuant to a tender offer made on June 22, 1982; or (2) purchased Cities Service common stock; or (3) purchased call options on Cities Service stock.
The class complaint includes (1) those who tendered their Cities shares to Gulf, (2) those who purchased Cities' shares from June 17, 1982, when Gulf announced its proposed acquisition of Cities, to August 7, 1982 when Gulf terminated the tender offer and (3) those who purchased call options on Cities' stock from June 17, 1982 to August 7, 1982. For ease of reference, I will refer to this complaint as the Class complaint and to these plaintiffs as the Class plaintiffs. In a complaint filed December 16, 1987, a group of class plaintiffs opted out of the class and filed their own complaint. The opt-out plaintiffs owned beneficially almost 3,800,000 or about 5% of the total common shares of Cities outstanding as of the date of the tender offer. They tendered their shares in response to Gulf's June 22, 1982 offer for over 50% of Cities shares, the first step in its proposed acquisition of Cities. These plaintiffs are W. Alton Jones Foundation, a not-for-profit New York organization, Wenonah Development Company, a Delaware corporation, and Foster & Foster, a Connecticut partnership whose individual partners include plaintiffs Foster Bam, a former Cities director, and his mother, Alma Foster Davis. Bam and Davis are also plaintiffs in their capacity as co-trustees of testamentary trusts under the wills of four deceased member of the Foster family. For ease of reference, I will refer to these plaintiffs as the Jones plaintiffs.
Although the plaintiff class is no longer unified, the two complaints are similar and have been consolidated for all purposes. The Class plaintiffs allege breach of contract and violations of ง 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. ง 78n(e), ง 10(b), 15 U.S.C. ง 78j(b) and Rule 10b-5 thereunder. The Jones plaintiffs allege breach of contract and common law fraud as well as violation of ง 14(e). In early 1988, defendants moved to dismiss the complaints, for failure to plead fraud with particularity as required by Fed.R. Civ.P. 9(b) and for failure to state a claim for contract breach. On September 14, 1988, defendants also moved for summary judgment. At a September 29, 1988 conference I permitted full discovery, while allowing defendants to pursue their motions as discovery continued. Both sides have modified their arguments at various points in the briefing. Therefore, to the extent this opinion presents the parties' positions, it deals only with their final positions, not with the detritus of every argument presented and then abandoned in the 900 or so pages of briefs the parties have inflicted on the court.
The motions are granted in part and denied in part, as set forth below.

I.
A bidding contest for control of Cities was begun on June 1, 1982 when, in response to a proposal for a friendly takeover of Cities for $50 per share made by Mesa Petroleum Corporation ("Mesa"), which had been accumulating Cities stock for two years, Cities commenced its own tender offer for Mesa stock at $17 per share. Mesa countered with a hostile tender offer for 15% of Cities at $45 per share. Fearing that a takeover by Mesa was imminent, Cities sought a "white knight" armed, inter alia, with a higher bid than Mesa's. *719 The white knight was Gulf. Early on the morning of June 17, 1982, the chief executive officers of Gulf and Cities agreed in a telephone conversation that, subject to Board approval, Gulf would tender for 51% of Cities at $63 a share. (Lee Dep. 228) Gulf's offer was to be followed by a merger of the two companies, at which point Cities' then unpurchased 49% stock interest in Gulf would be converted into Gulf debentures at $63 per Cities' share. (Merger Agreement ง 2.1) Later that morning, Gulf's Board unanimously authorized the acquisition. (DX 8)[1]
The plan unravelled over the summer, as the Federal Trade Commission ("FTC") objected to the deal, and then sued successfully to block it. Faced with an FTC demand that Gulf forfeit Cities' Lake Charles, Louisiana refinery, Gulf invoked a "litigation out" in the Offer to Purchase plaintiffs' shares which allowed it to terminate the deal if "action taken ... by any United States federal ... governmental authority ... in the sole judgment of the Purchaser ... would require the divestiture ... of a material portion of the business ... of the [Cities] Company." (Offer to Purchase at ง 15(d)) Plaintiffs argue that Gulf soured on the deal earlier in July, and then negotiated in bad faith with the FTC precisely to force the FTC to seek to enjoin the transaction so that Gulf could take advantage of the "litigation out" in the Offer to Purchase. Then, plaintiffs contend, after the FTC had sued and demanded divestiture of the Lake Charles refinery, Gulf in bad faith refused to agree to the divestiture, even though the Lake Charles refinery was not important to it and thus not "material" within the meaning of ง 15(d) of the Offer to Purchase.

A. The Lake Charles Refinery

According to plaintiffs, Gulf's purpose in acquiring Cities was to obtain Cities' domestic oil and gas reserves, so-called "upstream" assets. Replacing Gulf's depleting domestic reserves had been a management priority for some time. (Mahaffey Dep. 13-14; Murdy Dep. 14-15; PX 43; PX 7) Furthermore, according to plaintiffs, acquisition of Cities' downstream assets (refining, marketing and transportation), including the Lake Charles refinery, was viewed by Gulf as a negative aspect of the merger: as plaintiffs allege Gulf's chairman James E. Lee stated, it was "one of the cons." (Lee Dep. 271) Cities' lawyer Martin Lipton recalls Gulf representatives saying that they ascribed "no value" to the Lake Charles refinery. (Lipton Aff. ถ 6) According to plaintiffs, Gulf had severe losses in its own refining and marketing operations and was not pursuing Cities' downstream assets. (Wilder Dep. 18-19, 230-31) In fact, Gulf had decided that "we really needed to reduce refining capacity." (Lee Dep. 50-51); to that end, Gulf in 1981 considered selling or shutting down several of its refineries. (Lee Dep. 48-55; Mahaffey Dep. 234-35)
Defendants do not deny that Gulf wanted Cities' oil and gas reserves. However, defendants claim that Cities' only refineryโthe Lake Charles refinery โ was of interest also because it could process lowcost heavy sour crude, the least expensive crude in the market, into 100 percent unleaded gasoline, a capability in which Gulf found itself wanting. (Lee Dep. 12-17)
Gulf's outside counsel Daniel I. Booker of Reed Smith Shaw & McClay avers that Gulf General Counsel Jesse P. Luton told him on June 18 that Lake Charles could not be divested under any circumstances. (Booker Dep. 91-92) Defendants assert that every Gulf director has supported Lee's view that Lake Charles was crucial. (See Gordon Dep. 24; Singer Dep. 89; Colodny Dep. 94; Goodman Dep. 99; McAfee Dep. 94-95; Dickey Dep. 122-23; Higgins Dep. 65; Scully Dep. 106) At the time, Cities Chairman Charles Waidelich stated that the Lake Charles refinery would fit "very, very nicely to [Gulf's] needs ... our [Cities'] refinery is going to be very integrated into theirs [Gulf's]." (PX 23 at 2-3, Riley Wilson interview of Charles Waidelich, June 22, 1982) Furthermore, Cities, in its response to the FTC's demand for a specification of benefits to Gulf and Cities *720 from the transaction, stated that, "The benefits of the union of these two companies are enormous. The major ones include: ... The new units at Lake Charles will fit well with some of Gulf's needs." (DX 41 at 36) Finally, Campbell, of the FTC stated at his deposition,
I recall the phrase crown jewel was used, that Gulf considered the Lake Charles refinery so important that it was the crown jewel of the acquisition.
(Campbell Dep. 165) Accordingly, defendants claim they were justified in terminating the deal in August when the FTC demanded that Gulf sell Lake Charles.
Plaintiffs question whether Lake Charles in fact was important to Gulf, citing the following: (i) Booker, Gulf's outside counsel, did not tell Cities' lawyer Bertram Kantor or the FTC about the do-not-divest instruction (Booker Dep. 94-97, 196-97, 203-04); (ii) Lee avers that he told the Gulf Board about Lake Charles at the June 17 meeting, although the minutes reflect no mention of it until the July 13 Board meeting (PX 62); (iii) Gulf valued Cities' entire array of downstream assets at $564 million, later reduced to $350 million (PX 42 at 2) and one Gulf document records Gulf's original Lake Charles valuation at $140 million (PX 229), which was below the $200 million (4% of the total value of the merger to Gulf) that Gulf General Counsel Luton told the Gulf Board could be considered a benchmark for measuring a "material" asset; and (iv) Gulf had rejected as unjustified five or six years earlier the idea of a sour crude upgrading project at Gulf's Port Arthur refinery (Mahaffey Dep. 389-92, 614-17), and such a project was never pursued after Gulf terminated the Cities offer. Id. at 391.
Plaintiffs also question Gulf's estimate of the cost of divesting Lake Charles: (i) Gulf's estimate of $245 million in costs it might incur if it agreed to divest Lake Charles (PX 143) is based on the unsupported claim that Gulf would sell the refinery for zero, with no attempt to contact companies that had expressed an interest in buying downstream assets to see if they might be interested in Lake Charles; (ii) Gulf's total cost estimate of $1 billion, arrived at by including lost opportunity costs, was admitted to be "soft" by Lee who instead suggested that $500 million was a better figure (Lee Dep. 85-89); and (iii) Divestiture of Lake Charles would have helped Gulf's post-acquisition income and cash flow by reducing its debt burden and interest costs.
According to plaintiffs, concern over the high debt that would result from the merger led Gulf executives to contemplate divestiture of all or part of Cities' downstream assets, further undermining defendants' position that Cities' refinery at Lake Charles was the "crown jewel" of the deal. Thus, both Lee and Gulf Executive Vice President and Director Harold H. Hammer told Standard & Poor's of their determination to "vigorously pursue necessary divestmentsโboth Gulf and Cities." (PX 99 at 1) Hammer told Duff & Phelps, another bond rating agency, that Gulf "would be prepared to sell Cities downstream propertiesโin total โ if we could find a purchaser who would take responsibility for the people as well." (PX 102 at 2) Cities Chairman Waidelich recalls that Lee told him that Gulf would consider divesting one of its refineries, probably the Philadelphia refinery, after the merger. (Waidelich Aff. ถ 6) Finally, Gulf's lawyers at the July 30 injunction hearing allegedly described as "minuscule" the assets challenged by the FTC, although this appears to have been little more than legal puffery designed to downplay the import of the antitrust problems.

B. Possibility of Antitrust Problems

Both sides concede that FTC antitrust scrutiny was expected. Defendants maintain that the only antitrust problems foreseen by both companies were in gas marketing operations in the eastern part of the country, and that no one foresaw that the FTC would order sale of a major refining asset like Lake Charles. (Booker Dep. 71-72, 84-86, 126, 143, 413-15; Colodny Dep. 45-47, 96-97, 240, 293-295; Evans Dep. 213-15; Goodman Dep. 37-40) To support this proposition, defendants cite a public statement by Cities Chairman Waidelich:

*721 [W]e think the antitrust problems, if there are any, are not going to be serious and will be manageable.... [B]ased on what we believe to be gasoline marketing share, there are probably several states in the southeast, maybe in the northeast, where according to the guidelines of the government, this merger may stretch those guidelines and we might have to do some modest divesting of marketing facilities. I do not believe there will be any problem with any of our other operations from an antitrust standpoint, although the government can surprise us, of course, anytime. But we just feel gasoline marketing is really the only area where we will have any great problem.
(PX 23 at 3-4) Precisely because Gulf feared that the FTC might "surprise" the parties, Gulf added to the Offer to Purchase ง 15(d) under which Gulf could terminate or postpone "regardless of the circumstances" giving rise to the FTC suit including "any action or inaction by ... Gulf." That section left to Gulf's "sole judgment" the decision whether the FTC was demanding divestment of a "material" portion of Cities' assets. Defendants contend that the statements in the Offer to Purchase which referred to antitrust questions were warnings required by the securities laws that put plaintiffs on notice that the deal was highly contingent, not promises by Gulf that everything would come out all right in the end:
[Gulf] expects that a review of the Offer by the FTC ... will focus particularly upon the petroleum refining and marketing operations and markets of Gulf and [Cities]. Gulf believes that the combined petroleum refining and marketing operations of Gulf and [Cities] do not create a likelihood of antitrust challenge such as would prevent the consummation of the Offer. There can be no assurance that a challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See Section 15 for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions.
(Offer to Purchase at ง 16(c)) In a description of the Merger Agreement placed in the Offer to Purchase, the shareholders were also warned that, although the parties would use their "best efforts" to effect the merger, "there can be no assurance that the merger will take place, since ... it is subject to certain conditions, some of which are beyond the control of Gulf or the Company." (Offer to Purchase at ง 11)
Plaintiffs read these provisions differently. They claim that the statement that Gulf "believes that the combined petroleum refining and marketing operations" would not present an antitrust problem and that Gulf would use its "best efforts" were carefully written to convey, albeit in code, an alleged secret oral representation by Gulf that it was willing to divest any downstream assets, including Lake Charles, to satisfy the FTC. According to Cities' lawyer Henry Lesser, these statements in the Offer to Purchase
reflect[ing] Gulf's commitment to take whatever action, including divestiture, was necessary to resolve FTC antitrust concerns about downstream assets.... I ... understood that, in particular, Gulf and its counsel considered the language to be an accurate reflection of its perception that the FTC would have significant concerns about the effects of combining the downstream operations of the two companies, and of Gulf's anticipated strategy for preventing those concerns from disrupting its acquisition of Cities.
Id. at ถ 5. To support this claim, plaintiffs' lawyer, Martin Lipton, avers that when Hammer first spoke with him on June 14 about the possibility of Gulf acting as a white knight, Lipton raised possible antitrust problems. "Hammer replied, in words or substance, that Gulf had studied the antitrust implications of a merger backwards and forwards and that Gulf would divest Cities' entire downstream operations (meaning refining and marketing operations) if necessary to cure any antitrust problems." (Lipton Aff. ถ 3) Plaintiffs allege that in fact the only antitrust analysis by Gulf at that point had been done by a law student intern. During negotiation of the Merger Agreement, Cities expressly *722 raised antitrust problems regarding the combined downstream operations. According to Lipton, "[t]hroughout the negotiations, Gulf's representatives displayed little or no interest in the value of Cities' downstream assets." (Lipton Aff. ถ 5) Furthermore, Lipton states that on June 16
Gulf's representatives made statements which, in the context in which they were made, conveyed the message expressly or by implication that Gulf was willing to divest some or all of Cities' downstream assets to the extent required in order to obtain government antitrust approval. These statements included statements by the Gulf representatives that they did not want to waste time on antitrust issues and that Gulf had no interest in Cities' downstream operations.
Id. at ถ 6. Plaintiffs have provided the court with corroborative affidavits (Kantor Aff. ถถ 3, 4; Lesser Aff. ถถ 3, 6) and other evidence, including (i) a Gulf memorandum dated June 17 and prepared by Gulf's in-house counsel Frank W. Morgan which states that "Gulf is prepared to enter into arrangements to divest any offending assets" to secure antitrust clearance (PX 22 (emphasis added)); (ii) a June 7 analysis sent to Hammer from Charles Bowman in which he listed companies that might be interested in acquiring some or all of Cities' downstream assets, including Lake Charles (PX 13 at 3); (iii) notes of a June 23 meeting which records Lee saying "If [Gulf is] allowed [by the FTC] to keep Lake Charles ..." (Van Meter Aff. ถ 4 (emphasis added)); and (iv) minutes of Cities' board meeting at which the merger was approved, noting that "Gulf was prepared to make curative divestitures to remove any antitrust objection to the Merger Proposal" and that, given Gulf's willingness to make "necessary divestitures," it was likely that the transaction would be "consummated without undue delay." (PX 19 at 1-2; see also Waidelich Aff. ถถ 4, 5)

C. Gulf's July 13 Board Meeting

Plaintiffs claim Gulf soured on the deal for several reasons in July, and sought an "out" even before the FTC demanded divestiture of Lake Charles. Chief among them allegedly was a shortfall Gulf's engineers found in Cities' oil reserves, the assets that most interested Gulf. On July 1, a Gulf task force discovered what it thought were "discrepancies of considerable magnitude" between Cities' actual oil reserves and the level represented in Cities' financial statements. (Lee Dep. 349-53) This was a "shock and surprise" to Lee (Id. at 351), and was promptly discussed at a Gulf meeting on July 5 which focused on whether this reserves shortfall gave Gulf an "out" from the offer, although Gulf representatives strenuously deny that Gulf was actually considering terminating the offer at that point. (Mahaffey Dep. 140-42) The Merger Agreement and Offer provided that Gulf could terminate in the event Cities misrepresented its assets in the oil or gas reserves. (Merger Agreement at ง 4.6; Offer to Purchase at ง 15(e)) By July 7, however, it appeared that Cities had not misrepresented its oil reserves; rather, the alleged shortfall was attributable to "an engineering opinion difference" and Gulf "might have trouble proving Cities wrong" in its calculations. (PX 57)
Second, plaintiffs point out that the Offer and its $63 a share price tag generated criticism from shareholders (PX 58), from Wall Street (Wilder Dep. at 251), and from rating agencies such as Standard & Poor's and Duff & Phelps, which threatened to reduce Gulf's credit rating. (PX 24, 35, 48, 70) Gulf's stock fell $3.25 the day after the deal was announced which "surprised and disappointed" Gulf Chairman Lee. (Wilder Dep. 252; PX 30)
A third problem that arose in late July was the threatened loss of a tax benefit from the merger of close to $800 million, which Gulf had counted on. On July 1, Gulf learned that Congress was about to eliminate favorable "partial liquidation" tax provisions. (Moffett Dep. 147-48) The availability of tax relief remained in doubt throughout July as Gulf tried to have a "grandfather clause" inserted in the legislation to preserve the partial liquidation treatment for pre-July 1 merger agreements. *723 (PX 83; Morgan Dep. 478; Luton Dep. 508-09)
Fourth, on July 10, the failure of OPEC members to reach price agreements led to predictions that crude oil prices would fall, further reducing the value of Cities' reserves. (PX 63) Gulf's offer of $63 a share anticipated rising prices. (Mahaffey Dep. 105-6) After the July OPEC meetings, Gulf had to assume that the price of oil "will remain flat" over the next five years. (PX 98 at 2, item (4))
According to plaintiffs, these negative factors led Gulf to reexamine its commitment to the deal. The Board at a July 13 meeting, after hearing a presentation on the oil reserves shortfall and discussing the prediction of a drop in crude oil prices, left the decision whether to proceed with the offer "in limbo" in the words of Gulf Chairman Lee. (Lee Dep. 397) Defendants argue that plaintiffs distort Lee's testimony. Here is Lee's full testimony on this subject:
Q. Did the board consider at that point the subject of terminating the merger agreement, based upon the discrepancy in the oil reserves?
A. I don't think I would characterize it as consider terminating. We looked at the options that were open, asked counsel again about the options that were open, and decided to put the matter in abeyance for the time being, pending all the rest of the work that was going on relative to reviews, but with the intent of keeping all of our options open. [five page gap]
Q. What summary did you give?
A. I don't remember exactly what I did say at that point. I think, as I said earlier, that I said that if we proceeded with this merger, that one of the first things that we would do, that I would want to see done, would be a complete in-depth review of those reserves of their oil and gas done by DeGolyer & McNaughton. But as I sit here today, I can't tell you what else I did say.
Q. You prefaced that by saying "If we proceeded."
A. Yes.
Q. Was a decision made to proceed at that meeting?
A. The decision was put in limbo. I never put that to the directors, the question of whether we should proceed or not. It was left to be decided later.
Both sides agree that one directorโEdwin Singer โ urged at this meeting that the deal be scrapped. (Singer Dep. 79)

D. Negotiations With the FTC

Plaintiffs argue that, after July 13, defendants tried to goad the FTC to sue to enjoin the transaction, and then resisted only half-heartedly when the FTC did sue.
According to plaintiffs, Gulf triggered the Hart-Scott-Rodino Antitrust Improvements Act's ("HSR") ten-day waiting period prematurely, changed lawyers at the last minute, failed to propose any remedy for the FTC's principal antitrust concernโ the kerojet (jet fuel) market problem, and refused the FTC's request for an extension of time, even though Gulf's negotiator felt a settlement was imminent and its outside counsel had forwarded a draft agreement.
According to plaintiffs, Gulf triggered the 10-day HSR waiting period on July 19 even though it knew from prior FTC inquiries that the agency had serious concerns about the merger, including a "great concern" about a kerojet problem "tied to refinery." (PX 73 at 2) Plaintiffs argue that delay would have given Gulf a greater chance to develop remedies for the FTC's antitrust concerns.
Moreover, Gulf changed lawyers on July 15, bringing in William Jentes, a litigator at the Chicago firm of Kirkland & Ellis to replace Booker, a partner at Reed Smith Shaw & McClay. Kantor avers that Booker had developed an "excellent rapport with the FTC staff," while Jentes' first encounter with the FTC was "adversarial." (Kantor Aff. ถ 13) The FTC's Marc G. Schildkraut stated at his deposition that he "wasn't pleased to see [Jentes] arrive," having apparently had an earlier impression of him as "difficult to negotiate with." (Schildkraut Dep. 82-83, 79-80) Moreover, the change caused a delay so that Jentes *724 could learn the facts. (Booker Dep. 336, 340)
Plaintiffs dilate endlessly on Gulf's supposed inadequacies in failing to devise an acceptable strategy in the negotiations with the FTC before the July 29 deadline, and in failing to agree to an extension of time beyond July 29. In summary, they argue that Gulf, aware of the FTC's keen concern about the kerojet refining capacity of a merged entity (PX 73 at 2; PX 82 at 1; PX 85 at 1), considered and rejected a solution known as a Pasco remedy โ a committed supply contract that would allow Gulf to sell kerojet production from Lake Charles at market prices for a few years (Jentes Dep. 552-53, 559-60, 599-600; PX 90; Mahaffey Dep. 328-29) โ even though the director of the FTC's Bureau of Competition, Thomas Campbell, was favorably disposed toward a Pasco remedy. (PX 106 at 2, item 3) Plaintiffs argue that Gulf was adversarial, particularly in a July 26 letter to the FTC, when it should have been conciliatory (PX 95; Kantor Aff. ถถ 13, 14), declined to extend the FTC's time to consider alternatives to a lawsuit at a time when negotiations looked promising (PX 101 at 9-10; Lee Dep. 181; PX 91 at 3-6; PX 104), delayed efforts to line up purchasers even for assets Gulf knew would have to be divested (Murdy Dep. 200-03), and otherwise dragged its heels.
Plaintiffs also cite record evidence that Gulf's waning enthusiasm for the deal weakened its stance toward the FTC, including Jentes' report of "serious consideration" of Gulf "not going forward" if the FTC sued (Jentes Dep. 495, 504-05, 611-12), one employee's record of a rumor of "[m]anagement having second thoughts[;] [FTC suit] might be graceful way to back out," (PX 92; Todd Dep. 84), Jentes' purported view that "a preliminary injunction may not be the worst thing in the world,"[2] (Campbell Dep. 86-87; 120-22, 137-38), and a statement by a Gulf representative to Campbell of the FTC that Gulf might not resist a preliminary injunction. (Campbell Dep. 131-32) Further, plaintiffs claim that Gulf purposely pursued an unproductive strategy of meeting with individual FTC commissioners, failing to propose alternatives after the July 26 letter, and not meeting with the FTC from July 28, when the commission voted to sue, until August 3, four days after a temporary restraining order (TRO) issued.
Plaintiffs allege that Gulf did not resist a TRO on July 29 because it was having second thoughts about the merger. To support this contention, they note that Campbell testified that he believed Gulf had decided not to contest the TRO (Campbell Dep. 137-140), and that, after the hearing had ended, Gulf's lawyer Donald Kempf told him that "things were up in the air." Id. at 268. Furthermore, they allege that a July 29 Gulf Board Executive Committee meeting was largely taken up with possibilities for terminating the deal, not with fighting the injunction. According to Director Singer, the Committee was told that the kerojet problem seemed "insurmountable" and that the situation "looked dark." (Singer Dep. 110) Plaintiffs claim that the beginning of the Board meeting the next day was similarly gloomy as Board members were advised of possible liability if the deal was terminated: Lee testified that "in the early part of this meeting, my sense was that we were leaning in the direction of termination." (Lee Dep. 481-82) By the end of the meeting, however, after a report from Jentes in which he stated that he "was very, very, close to reaching an agreement," "the mood of the meeting changed at that point" and the Board voted unanimously to postpone purchase of shares until August 9 and thus continue the deal. (Id. at 481, PX 123 at 8) Plaintiffs infer from this sequence that the Board realized at some point it was open to massive liability if it did not make at least one more effort at settlement. Although Gulf's lawyers then were allowed to contest the injunction, Gulf had no firm intention to close the deal even if there was an FTC settlement; as Lee testified, if Gulf settled with the FTC, Gulf *725 would "consider the matter again" before closing the deal. (Lee Dep. 483-84)
On August 3, the FTC demanded divestiture of the Lake Charles refinery. No Cities lawyers attended that meeting. Jentes complained at the meeting that Campbell had reneged on his promise that a Pasco remedy would be acceptable; Jentes refused to agree to a sale of Lake Charles. (Jentes Dep. 815) Jentes scheduled a second meeting that afternoon with the FTC and invited Cities' Kantor. (Jentes Dep. 815-16) At this second meeting, Jentes submitted a draft consent order with a Pasco remedy. According to Kantor, this order was "totally inadequate" because it limited the supply contract in two ways: the price would be keyed not to the market but to prices charged by Gulf elsewhere, and the remedy would apply to only 40% of combined production of kerojet. (PX 132 at 7-8; Kantor Aff. ถ 38) According to Kantor, this proposal "left Gulf entirely in control and provided the FTC with no protection against Gulf's anticompetitive conduct with respect to jet fuel." Id. Plaintiffs aver that Gulf added insult to injury by giving the FTC only 24 hours to respond. Plaintiffs point to handwritten notes by Gulf's director Colodny showing that Lee on August 3 said that Gulf wanted to "break off negotiations" with Campbell. (PX 133) It was at the August 3 afternoon meeting that Campbell said Gulf had not negotiated "in good faith" and had "sought [the] TRO." (PX 134, Morgan Dep. 610-12) Campbell rejected Gulf's proposal in an August 4 letter. (PX 137)
According to plaintiffs, although the FTC left open an alternative divestiture of a Gulf refinery, for example refineries at Port Arthur, Alliance or Philadelphia, rather than the Lake Charles refinery (PX 136; Hardie Dep. 565; Morgan Dep. 651; DX 97 at 2; DX 98 at 2 ("Any comparable refinery to Lake Charles โ Port Arthur would be acceptable โ even if it is a less efficient refinery")), Gulf's position was that it would not consider divesting any refinery. Plaintiffs aver that sale of a Gulf refinery would have cut Gulf's admitted refinery over-capacity. Indeed, plaintiffs cite statements by Gulf in late July that Gulf would sell a refinery after the merger was complete. As Gulf told Standard & Poor's on July 26, "Gulf Oil would like to keep Cities Service's Lake Charles refinery. If they were allowed to keep it, they would attempt to sell or close one of their other major refineries (i.e. Philadelphia)." (PX 97 at 4)
Waidelich states that, at this point, he called Lee on August 4 and reminded Lee of his commitment to divest any refinery necessary. (Waidelich Aff. ถ 12) Waidelich offered to adjust the offer price to take into account this loss. Id. The next day, according to Waidelich, Lee and Hammer attempted to renegotiate a "shopping list" of items in order to continue with the merger, including the transaction's tax treatment. Id. at ถ 14. Plaintiffs allege that the August 6 Board meeting at which the decision to terminate was made was taken up mostly with non-FTC reasons to end the deal.
Needless to say, defendants paint a far different picture of events leading up to the deal's termination. In their view, there was no premature commencement of the 10-day HSR period; rather, long negotiations preceded that step, progress toward FTC approval was apparently being made, and counsel anticipated resolving the FTC's remaining objections within the 10-day HSR period. (Booker Dep. 127, 134-35, 147, 326-27; Booker Aff. ถถ 10, 13; Morgan Aff. ถถ 8, 10, 12, 13) They attribute Gulf's change of counsel to a desire for more experience and "more gray hair." (Luton Dep. 95; Evans Dep. 334; Jentes Dep. 6, 9; Booker Dep. 116, 130)
To the plaintiffs' swarming attack on Gulf's strategy in negotiations with the FTC, defendants respond with a swarming defense. They deny being aware until July 23 that kerojet refining capacity was the FTC's main problem with the deal or that the FTC would seek refinery divestiture. (Booker Aff. ถ 7; Booker Dep. 243-46; Jentes Dep. 253-55; Luton Dep. 171-72; Morgan Aff. ถ 18; DX 49 at 3; Henderson Aff. ถ 25 n. 14) They deny that the FTC's position was obviously serious even then. *726 (Jentes Dep. 254, 270-71, 391, 516-17; Goold Dep. 223, 227, 244; Morgan Aff. ถ 18) They insist that Gulf had ample basis to contest the FTC's definition of the kerojet market. (George Hay Aff.; Booker Dep. 484-85; DX 121 at 610) Defendants offer evidence challenging the FTC's receptiveness to a Pasco remedy (Schildkraut Dep. 196-97; Campbell Dep. 473) and illustrating Jentes' flexibility in proposing one, notwithstanding that he had to check with Gulf executives before suggesting a longterm arrangement. (Booker Dep. 493, 498; Hammer Dep. 435-37; Morgan Dep. 714-15) Whether the Pasco remedy might have been accepted if proposed earlier or in more detail remains an open question. Certainly the FTC did not react negatively to it until after the TRO issued. (Henderson Aff. ถ 65)
Defendants' response to the claim that Gulf was combative when it should have been conciliatory, and vice-versa, is what one might expect. Thus, evidence is adduced that it was the FTC and not Gulf that rejected settlement before the TRO was in place on July 29 (Morgan Aff. ถถ 14, 21; Campbell Dep. 349, 512; DX 82), that the FTC presented no proposed remedies on June 26 and 27 (Jentes Dep. 526-27; 536-37; Goold Aff. ถถ 3-8), that the FTC's Campbell did not provide the Commission's (as opposed to his own or the staff's) views on what was needed for approval until July 28 (Goold Aff. ถ 15; see also Jentes Dep. 526-27, 536-37; Goold Aff. ถถ 3-8, 16; DX 76 at 2; DX 80 at 2), that it made no sense to suggest divesting refineries until Gulf knew what the FTC wanted to achieve, that Cities' lawyers who are now critical of Gulf's negotiating position supported it at the time (Morgan Aff. ถถ 15, 17, 19; Goold Aff. ถถ 14, 47; Jentes Dep. 204-05; Booker Aff. ถ 12), and that a strategy involving delayed purchase of the tendered shares risked liability and the appearance that Cities and Gulf were colluding to the detriment of shareholders. (Morgan Dep. 755, 769)
To plaintiffs' contention that Gulf did not oppose the TRO, defendants note that the FTC's chief litigator at the hearing, David Shonka, told Campbell that Gulf "fought it [the TRO] hard." (Campbell Dep. 443, 444) Concerning the July 30 Gulf Board meeting, defendants confirm that, although the tenor of discussion early on favored termination, Jentes' advice that further negotiations might prove fruitful swayed the Board. Defendants admit that the Board discussed in depth the possibility of termination. Moreover, defendants admit many of plaintiffs' claims that Gulf had found other problems in the proposed merger in July. Specifically, defendants note that
due diligence evaluation of Cities after June 17 had uncovered many adverse aspects of Cities' financial condition including potentially extensive environmental liabilities, an apparent overstatement of some 41 million barrels of Cities proved developed oil reserves (one of the principal attractions of Cities for Gulf), a commitment to expend over $100 million on a Cities' headquarters building in Tulsa and a risk of loss of valuable tax benefits if the merger were delayed beyond October 1.
(Defendants' April 14, 1989 Reply Memorandum at 6, 160-61)
Even conceding these other problems, defendants claim that Cities knew the FTC's August 3, 1982 demand for the Lake Charles refinery was a legitimate reason for Gulf to terminate. The August 3 demand for divestiture of Lake Charles within two years was a complete turnaround from Campbell's earlier willingness to consider a Pasco remedy for Lake Charles. As Goold put it,
Mr Jentes and I expressed shock at the new FTC terms, pointing out they were a radical departure from the July 28 position. Mr. Jentes read aloud my notes of Mr. Campbell's statement on July 28 ... and asked Mr. Campbell, wasn't this the position of the FTC last Wednesday? Mr. Campbell confirmed that my notes were accurate, but stated that he had new instructions from the Commissioners.
(Goold Aff. ถ 24) When Campbell stated that he believed Gulf was not acting in good faith at the afternoon meeting on *727 August 3,[3] Kantor replied that the divestiture demand was disproportionate to the alleged antitrust problem โ an overlap in the kerojet market which was less than 4% of the refinery's output โ and otherwise defended Gulf's conduct. (DX 97 at 4). He stated: "[The] [p]unishment has to fit the crime.... [The[ [p]roblem is my fingernail, but you want to cut off my head." (DX 97 at 3) He also told the FTC that this demand would kill the deal. Id.
Defendants take issue with plaintiffs' assertion that they demanded a response to their proposed draft consent order within 24 hours. Furthermore, even though Campbell's August 4 letter rejected defendants' proposed order, Gulf called Campbell to schedule a meeting for that evening. (Goold Aff. ถ 38) At that meeting, Morgan asked "Can we work around refinery divestiture?"; he was told that the "you ought to assume the refinery is very important" although "[Campbell] might support an alternative but `the message after checking with all four Commissioners was that `it[']s a refinery.'" (Goold Aff. ถถ 39, 40) Morgan then "asked Mr. Campbell if he would consider divestiture of Gulf's Philadelphia or Santa Fe Springs refinery. Mr. Campbell said no." (Morgan Aff. ถ 31) According to Campbell, divestiture of Lake Charles was "almost our position" and "[i]t would have taken quite a package of refineries otherwise to satisfy our antitrust concern." (Campbell Dep. 172)
Defendants assert that the Gulf Board was caught between the FTC's intransigence, and the prospect that divestiture of Lake Charles within two years would yield little and would cost Gulf over $1 billion in lost opportunity costs; other alternatives either were as bleak or were unacceptable to the FTC. (Lee Dep. 77-78; Goodman Dep. 200; McAffee Dep. 89-91; Morgan Aff. ถ 31) Thus, the Board had no choice but to terminate. (Murdy Dep. 155-56)

II.
Although defendants initially moved to dismiss the contract and fraud claims, they also moved for summary judgment. Given the sheer volume of material before me now, neither party can deny that this motion is more properly one for summary judgment. Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when, viewing the record in the light most favorable to the nonmoving party, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 996, 8 L.Ed.2d 176 (1962) (per curiam); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 239 (2d Cir.1985), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), there "is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). To defeat such a motion, the nonmoving party must offer "`concrete evidence from which a reasonable juror could return a verdict in his favor.'" Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988) (quoting Anderson, 477 U.S. at 256, 106 S.Ct. at 2514) (emphasis added). See Clements v. County of Nassau, 835 F.2d 1000, 1005 (2d Cir.1987). Rule 56(e) requires entry of summary judgment against a plaintiff who fails to establish any essential element of his case on which at trial he would bear the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This is because "[T]his standard mirrors the standard for a directed verdict under the Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.
For the common law contract and fraud claims, a federal district court applies the substantive law of the state in which it sits. Erie R.R. v. Tompkins, 304 U.S. 64, *728 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Choice of law rules are substantive. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties' elephantine briefs do not discuss choice of law. Cf. Greater Continental Corp. v. Schechter, 304 F.Supp. 325, 329-330 (S.D.N.Y.1969), appeal dismissed, 422 F.2d 1100 (2d Cir.1970). Rather, both sides rely mainly on New York law, although they cite cases from Washington to New Hampshire to Georgia. The Merger Agreement, but not the Offer to Purchase, is expressly made subject to Delaware law, see Merger Agreement at ง 10.8(iv); several other states โ Pennsylvania, home of Gulf, and Oklahoma, Cities' headquarters โ have an interest in this litigation. I need not reach this choice of law question because no conflict among the laws of the interested states has been shown to affect plaintiffs' claims, which center on the document to which plaintiffs are parties โ the Offer to Purchase, not the Merger Agreement. Deep South Pepsi-Cola Bottling Co., Inc. v. Pepsico, Inc., 88 Civ. 6243 (PKL), slip op. at 20 n. 3, 1989 WL 48400 (S.D.N.Y. May 2, 1989); see also Lehman v. Dow Jones & Co., 783 F.2d 285 (2d Cir.1986). However, because the Merger Agreement is subject to Delaware law, plaintiffs' claim as third-party beneficiaries of the Merger Agreement would seem to be governed by Delaware law; accordingly, I will rely on Delaware law on that issue.

A. Contract Claims

Faced with a contract โ the Offer to Purchase โ which, as will shortly become apparent, affords plaintiffs only slight support for their claim of contract breach, plaintiffs would invoke the "best efforts" obligation contained in an agreement they were not parties toโthe Merger Agreement. Alternatively, they would use what they claim are ambiguous contract terms in the Offer to Purchase โ most particularly its description of the Merger Agreement's best efforts clause, and its warning of potential antitrust problems which defendants were required to insert so as to comply with U.S. securities laws โ as a wedge to insert extrinsic evidence of Gulf's alleged secret representation to Cities that Gulf was willing to divest any downstream asset, including the Lake Charles refinery.
It is a fundamental principle of contract interpretation that, absent ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible. International Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 100 (2d Cir. 1989). See also United States Naval Inst. v. Charter Communications, Inc., 875 F.2d 1044, 1048 (2d Cir.1989); Enercomp, Inc. v. McCorhill Publishing, Inc., 873 F.2d 536, 549 (2d Cir.1989). Moreover, both contracts here were completely integrated. The Merger Agreement contains an integration clause which states:
This Agreement ... constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any one of them, with respect to the subject matter hereof.
(Merger Agreement at ง 10.8) The Offer to Purchase states:
No person has been authorized to give any information or make any representation on behalf of the Purchaser or Gulf not contained in this Offer to Purchase or in the Letter of Transmittal and, if given or made, such information or representation must not be relied upon as having been authorized.
(Offer to Purchase at ง 18) When contracts contain integration clauses as they do here, extrinsic evidence may not be admitted to prove different or additional terms in the contract, although it may be admitted to interpret ambiguous terms of an integrated contract. Proteus Books, Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 509-10 (2d Cir.1989); 4 S. Williston, A Treatise on the Law of Contracts งง 631 (3d ed. 1957 & Supp.1988); Restatement (Second) of Contracts ง 212 (1981).

1. Antitrust Warning in the Offer to Purchase
Plaintiffs reason first that extrinsic evidence may be introduced of Gulf's secret oral promise to divest any downstream assets *729 because ง 16(c) of the Offer to Purchase, the contract between Gulf and plaintiffs, is an ambiguous clause. Section 16(c) provides, in pertinent part:
[Gulf] expects that a review of the Offer by the FTC ... will focus particularly upon the petroleum refining and marketing operations and markets of Gulf and [Cities]. Gulf believes that the combined petroleum refining and marketing operations of Gulf and [Cities] do not create a likelihood of antitrust challenge such as would prevent the consummation of the Offer. There can be no assurance that a challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See Section 15 for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions.
(Offer to Purchase at ง 16(c)) As plaintiffs well know from their briefing of the securities claims here, these statements were required by United States securities laws to provide Cities' shareholders with full disclosure of all material facts which could affect their decision to tender. Certainly, the possibility of antitrust problems that might make the deal illegal is a material fact which must be disclosed. Gulf & Western Ind., Inc. v. Great A & P Tea Co., 476 F.2d 687, 697 (2d Cir.1973) (G & W failed to disclose possible antitrust problems in tender offer for A & P's stock). This language is descriptive and precatory; it does not create a contractual obligation. The reader is told Gulf "expects" the FTC to scrutinize the transaction, that Gulf "believes" there are no antitrust problems that would prevent consummation, but that there can be "no assurance" that the FTC will not mount an antitrust challenge; and if it does, there can be no assurance what the result will be, including litigation and an injunction barring the merger.
Moreover, even if ง 16(c) could be viewed as a contractual obligation as opposed to merely a warning mandated by securities laws, it is not ambiguous. To the contrary, it warns clearly that, although Gulf "believ[ed]" any antitrust problem could be cured, there could be "no assurance" that an antitrust challenge would not arise or what the outcome would be if one did. As a further warning, the shareholder is directed by ง 16(c) to ง 15, which empowered Gulf to terminate if, as ง 16 forewarned, the FTC sued to enjoin the transaction. Section 15 left to Gulf's "sole judgment" the determination of whether the FTC, if it did sue, was demanding divestment of a "material" portion of Cities' assets, although such judgment had to be made in good faith. See pp. 738-40, infra. Section 15 establishes Gulf's right to terminate if the FTC sues, "regardless of the circumstances giving rise" to such a lawsuit and specifically regardless of whether "any action or inaction by [Gulf]" gave rise to the lawsuit. Section 16 is thus not only not a representation that Gulf would divest certain assets if the FTC so required; rather, it is an unambiguous warning to plaintiffs that, if the FTC sought to enjoin the merger, Gulf could decide not to fight, but rather to terminate the deal. Moreover, Gulf could do that "regardless of the circumstances" surrounding the action, even if Gulf's own "action or inaction" precipitated the lawsuit.[4]Gilbert v. El Paso Co., 490 A.2d 1050, 1055 (Del.Ch.1984) ("while the result of Burlington's termination of its December tender offer might appear unfair to those shareholders who tendered their shares in response to the announcement, it cannot be said that they were misled concerning Burlington's right to do so").
Indeed, even if ง 16(c) could be viewed as an ambiguous contract term, *730 ง 15 explicitly overrides it by permitting Gulf to terminate "notwithstanding any other provision of the Offer." "Notwithstanding" means "take[s] precedence over" and thus negates any contrary provision of the Offer to Purchase. King v. Sununu, 126 N.H. 302, 490 A.2d 796, 800 (1985); State v. Lynch, 137 Vt. 607, 409 A.2d 1001, 1004 (1979); State ex rel. Carmean v. Board of Education, 170 Ohio St. 415, 165 N.E.2d 918, 923 (1960). Moreover, to the extent that there is an inconsistency between a general clause like ง 16(c) and a specific one like ง 15, the specific clause "operate[s] as a modification and pro tanto nullification" of the general clause. 3 Corbin on Contracts, ง 547 at 176 (1960 & Supp.1989); Restatement (Second) of Contracts at ง 203. Again, and significantly, ง 15 states explicitly that Gulf's right to terminate if the FTC sues (or if one of the other enumerated events occurs) exists "regardless of the circumstances giving rise" to such a lawsuit and regardless of whether "any action or inaction by [Gulf]" caused the lawsuit. Section 15 thus not only contemplated that Gulf might decide to terminate the contract if it encountered serious trouble from the FTC; it also gave Gulf the right to do so even if it chose to do nothing to prevent the FTC's threat to block the merger; even if it chose, for example, not to sell the Lake Charles refinery, so long as that decision, if based on the value of the facility, was taken in good faith. See pp. 738-40, infra.

2. The "Best Efforts" Clause
Plaintiffs' next offer a set of variations on one theme: a right of action under the Merger Agreement's "best efforts" clause. A "best efforts" clause requires that one work toward the object of the contract "to the extent of [one's] total capabilities." Bloor v. Falstaff Brewing Corp., 454 F.Supp. 258, 267 (S.D.N.Y.1978), aff'd, 601 F.2d 609 (2d Cir.1979). Plaintiffs claim that Gulf failed to use its best efforts to negotiate a settlement with the FTC. Because plaintiffs are not parties to the Merger Agreement and the contract to which they are parties, the Offer to Purchase, contains no such "best efforts" clause, plaintiffs' arguments fail.
Plaintiffs claim that ง 11 of the Offer to Purchase, which contains a description of the Merger Agreement's terms including that agreement's "best efforts" clause, itself constitutes an explicit promise to plaintiffs from Gulf that Gulf would use its "best efforts." The meaning of a best efforts clause is "properly determined by the court as a question of law from the four corners of the contract." Foster v. Citrus County Land Bureau, Inc., 133 A.D.2d 665, 666, 519 N.Y.S.2d 836, 837 (2d Dep't 1987). Section 11 states explicitly that it merely summarizes provisions of the Merger Agreement so as to provide full disclosure of all material facts to shareholders. Thus, it begins:
The following is a summary of certain provisions of the Merger Agreement, the full text of which has been filed as an exhibit to the Purchaser's Schedule 14D-1. See Section 18. Such summary is qualified in its entirety by reference to such terms.
Plaintiffs admit that ง 11's description of the Merger Agreement is mandated by securities regulations (Pltf.'s March 1, 1989 Memorandum at 46 n. 20), but question why Gulf chose to include certain provisions of the Merger Agreement while excluding others. I find this argument unpersuasive: Gulf, as it stated, was providing only a "summary" and told shareholders where they could find the complete Merger Agreement. There is no suggestion that Gulf was reciting certain Merger Agreement terms with the intent of making those terms promises to shareholders as well. The relevant portion of ง 11 states that
[e]ach party has agreed to use its best efforts to cause the Merger to occur. However, there can be no assurance that the Merger will take place, since, as indicated above, it is subject to certain conditions, some of which are beyond the control of Gulf or the Company.
Like ง 16, ง 11's reference to best efforts is not ambiguous such that extrinsic evidence is necessary. Far from being a *731 promise to use best efforts, ง 11's statement that "there can be no assurance" that the Merger will take place, because of conditions "some of which are beyond" the parties' control (necessarily meaning that "some" of the factors were within Gulf's control), is absolutely consistent with งง 15 and 16's warning that Gulf could choose not to contest an FTC challenge but could simply terminate the deal. Section 11 cannot be read to promise anything.
Plaintiffs cite Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp., 534 F.2d 422 (2d Cir.1975), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976), for the proposition that when the Offer to Purchase referred to the best efforts clause in the Merger Agreement, such a reference incorporated that clause. That case concerned a strike settlement agreement which stated that strikers would be allowed to return to work "in accordance with their seniority and demonstrated ability pursuant to article VII, ง 2 of the [collectively bargained] contract." 534 F.2d at 431 n. 3. The court held that the settlement agreement incorporated only that term of the collectively bargained agreement, stating that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it part of their agreement only for the purpose specified." Id. at 441. Here, however, the language of ง 11โboth in the introductory statement describing it as a "summary" and in the warning of "no assurances"โ makes it quite plain that the description of contract terms from the Merger Agreement was intended solely to provide full disclosure of material facts to shareholders, not to create new contractual rights. See United California Bank v. The Prudential Ins. Co., 140 Ariz. 238, 681 P.2d 390, 412 (Ct.App.1983) (absence of language in contract evidencing intent to incorporate loan application agreement, descriptive nature of reference to loan application, and fact that loan application was not physically attached all support a finding of no incorporation).
Alternatively, plaintiffs argue that the Merger Agreement and the Offer to Purchase should be considered a single contract such that plaintiffs could sue under the Merger Agreement's "best efforts" clause. "Whether a number of promises constitute one contract or more than one is to be determined by inquiring `whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatsoever, if any promise or set of promises were struck out.'" United States v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 587, 86 L.Ed. 855 (1942) (quoting Williston on Contracts at ง 863). Both the text and the context of these contracts demonstrate that each agreement was complete unto itself. United States v. Wallace & Wallace Fuel Co., 540 F.Supp. 419, 426 (S.D.N.Y.1982); United California Bank, 681 P.2d at 410; Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 36 N.E.2d 106 (1941). Each contained an integration clause. See Merger Agreement at ง 10.8; Offer to Purchase at ง 18. As plaintiffs now concede, the Merger Agreement was not physically attached to the Offer to Purchase. (Pltf.'s March 1, 1989 Memorandum at 46 n. 19) The two agreements were part of two separate transactions; the Offer to Purchase was designed to effect the first phase of the $63 a share cash-out offer to the sole benefit of the Cities shareholders, while the Merger Agreement created the mechanism whereby the two companies could merge after the Offer to Purchase was successfully concluded. Nau does not assist plaintiffs. There the court construed a general contractor agreement, a subcontracting agreement, and a joint venture agreement between the two parties as one integrated document because the subcontracting agreement specifically stated that it was subject to the general contractor agreement and that the goods were warranted to conform to the specifications of the municipality, the ultimate client. All three agreements were obviously part of the same transaction and were designed to "effectuate the same purpose"; manufacturing subway turnstiles. 286 N.Y. at 197, 36 N.E.2d 106. Here, there were separate contracts for separate purposes. To the extent that plaintiffs are proposing that all *732 contracts vaguely relating to the same deal should be read together in spite of explicit language to the contrary in those contracts, so that a party to only one of the contracts can willy-nilly enforce provisions of the other contract, that argument has absolutely no support in contract law and certainly gains no support from Nau.
Plaintiffs claim, however, that an Oklahoma state judge,[5] construing these very contracts, held that the Merger Agreement and Offer to Purchase constituted one agreement. (February 22, 1985 Tr. at 3) His oral statement, however, did not concern whether shareholders who were parties only to the Offer to Purchase could sue under the Merger Agreement. Rather, he spoke in response to Cities' argument that it was not bound by language in the Offer to Purchase that does not appear in the Merger Agreement. The judge did not hold, nor did he suggest, that clauses in the Merger Agreement could be transported into the Offer to Purchase, so that shareholders could enforce them. To the contrary, he held that the claims of two Cities shareholders who were also suing Gulf in the Oklahoma action were misjoined because they arose under a contract (the Offer to Purchase) separate from Cities' contracts with Gulf. Id. at 6. Finally, if and to the extent that Judge Caldwell's decision does suggest that these two contracts are one, I respectfully disagree for the reasons noted above.
Even if ง 11 could be deemed a "best efforts" promise to plaintiffs or if the Merger Agreement and the Offer to Purchase could be considered a single contract, this promise is superseded by ง 15, which states that "notwithstanding any other provision of the Offer,"[6] Gulf has the complete and unabridged right to terminate regardless of whether its "action or inaction" gave rise to an FTC lawsuit and "regardless of the circumstances." 3 Corbin on Contracts, ง 547 at 176. In Wallace & Wallace Fuel Co., 540 F.Supp. 419, defendants argued that the ambiguity of the best efforts clause similarly invited extrinsic evidence. There, as here, the "best efforts" clause was overridden by another provision of the contract. The court held:
No ambiguity is presented in the instant best efforts clause. This clause is not a guarantee and this court will not allow the Wallace parties to introduce extrinsic evidence attempting to prove that the parties really intended to commit the SBA to future 8(a) contracts.
540 F.Supp. at 427. Here too, even assuming that the Offer to Purchase's description of the Merger Agreement's "best efforts" clause, followed closely by a complete disclaimer ("no assurances"), constitutes a clear promise by Gulf that it would use its best efforts to effect the merger, or that the contracts, despite their integration clauses, constituted one contract, ง 15 overrides that obligation and permits Gulf wide latitude to terminate regardless of the circumstances and regardless of its action or inaction in dealing with the FTC.
Although plaintiffs allege that this interpretation of ง 15 would wipe out the best efforts clause and cites the rule that a contract should be interpreted in a way that ascribes meaning, if possible, to all of its terms, United States Naval Inst., 875 F.2d at 1049-50, defendants correctly note that ง 15 comes into play only upon the occurrence of a specified "condition out"โ an FTC challenge. This construction of the contract gives meaning to the protective *733 language of ง 15 while also giving meaning to the "best efforts" language plaintiffs seek to import from the Merger Agreement. It also retains the meaning of the language of ง 15 ("notwithstanding any other provision of the Offer ...") as well as the language of the "best efforts" provisions in the Merger Agreement, which makes any "best efforts" obligation "subject to" the conditions of the contracts. Plaintiffs' proposalโmaking ง 15 of the Offer to Purchase subject to the best efforts clause of the Merger Agreementโignores the language that makes the "best efforts" clause in the Merger Agreement "subject to" the conditions specified in Annex I of the Merger Agreement and ง 15 of the Offer to Purchase.
Next, plaintiffs pursue a third-party beneficiary theory. They argue that they were intended beneficiaries of the Merger Agreement and thus can sue Gulf directly under the Merger Agreement for its alleged failure to use its best efforts to effect the merger. Third parties to a contract may seek to enforce that contract only if (a) recognition of the third party's right to performance carries out the intention of the direct parties to the contract, and (b) the promisee intends to give the third party "the benefit of the promised performance." Restatement (Second) of Contracts at ง 302(1). Although a third party need not be specifically mentioned in the contact before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement. New York State Energy Research & Dev. Authority v. Nuclear Fuel Serv., 561 F.Supp. 954, 979 (W.D.N.Y.1983); Port Chester Electrical Constr. Corp. v. Atlas, 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976); see also Hylte Bruks Aktiebolag v. Babcock & Wilcox Co., 399 F.2d 289, 292 (2d Cir.1968). Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract. Port Chester, supra. Delaware law, to which the Merger Agreement is expressly made subject, see Merger Agreement at ง 10.8(iv), agrees that whether the parties intended to create a third-party beneficiary turns on the contract language. American Financial Corp. v. Computer Sciences Corp., 558 F.Supp. 1182, 1185 (D.Del.1983) and Delaware state cases cited therein. Explicit language in the Merger Agreement demonstrates that the parties specifically intended not to confer third-party beneficiary status on anyone. Section 10.8(ii) states:
This agreement (including the Annex, documents and instruments referred to herein) (i) constitutes the entire agreement ... among the parties ... [and] (ii) ... is not intended to confer upon any other person any rights or remedies.
Even the Corbin treatise, the leading proponent of the view that extrinsic evidence may be considered in determining whether third-party beneficiary status was appropriate, 4 Corbin on Contracts, ง 776 at 7 (Supp.1971), has stated that
[I]f two contracting parties expressly provide that some third party who will be benefitted by performance shall have no legally enforceable right, the courts should effectuate the express intent by denying the third party any direct remedy.
4 Corbin on Contracts, ง 777 at 25 (1951). I thus find inapposite cases cited by plaintiffs for the proposition that a court should refer to extrinsic evidence in determining third-party beneficiary status. See, e.g., American Elec. Power Co. v. Westinghouse Elec. Corp., 418 F.Supp. 435, 448-49 (S.D.N.Y.1976); Honaker v. Farmers Mutual Ins. Co., 313 A.2d 900, 902 (Del.Super. Ct.1973); Stahl v. Rawlins, 304 S.W.2d 549, 556 (Tex.Civ.App.1957).
Faced with ง 10.8's preclusive effect on their third-party beneficiary argument, plaintiffs argue that ง 10.8 does not apply to shareholders because it includes "instruments ... referred in the Agreement" and the Offer to Purchase was referred to in the Merger Agreement. Accordingly, plaintiffs argue that the Offer to Purchase is part of the "entire agreement" and, since shareholders are parties to the Offer to Purchase, they are not excluded from ง 10.8's language negating an intention to confer rights "upon any other person." *734 Defendants correctly respond that the language "instruments ... referred in the Agreement" is limited to those agreements "among the parties" and, since even the shareholders agree they were not "parties" to the Merger Agreement, plaintiffs' imaginative reading of ง 10.8 fails. So does plaintiffs' claim that ง 10.8 was really meant to apply only to Mesa. The plain language says "any other person"; that it might bar Mesa as well as Cities' shareholders does not mean that plaintiffs can introduce extrinsic evidence to show that language clear and unambiguous on its face ("any other person") has a hidden meaning. See pp. 728-29.
Plaintiffs note that Gulf promised in the Merger Agreement to purchase 41,500,000 Cities shares at $63 per share and that each share purchased by Gulf would later be "converted into a right to receive a fixed income security" worth at least $63. Again, however, those promises were integral to the merger; they simply do not evince any more general intent to benefit Cities shareholders, especially in the face of the provision noted above expressly excluding any third party beneficiary. Compare Midwest Concrete Prods. Co. v. La Salle Nat'l Bank, 94 Ill.App.3d 394, 49 Ill.Dec. 968, 970-71, 418 N.E.2d 988, 990-91 (1981) (that subcontract was made "subject to" general contract insufficient to confer third party status on party to subcontract agreement) with Oil Capital Racing Ass'n, Inc. v. Tulsa Speedway, Inc., 628 P.2d 1176, 1178 (Okla.Ct.App.1981) (court found race car drivers third-party beneficiaries under raceway promotion contract where the contract expressly stated that "Speedway agrees to pay to drivers of Stock Cars at such racing events a minimum of forty (40%) per cent of gross admission" (emphasis added)). A district judge in Colorado dismissed a similar third-party beneficiary theory where shareholders of a target attempted to enforce the merger agreement. Brooks v. Land Drilling Co., 564 F.Supp. 1518 (D.Colo.1983). The merger agreement, as here, made reference to the mechanics of the stock swap if the merger went through; the court found that this reference was not an express recitation on the face of the document that the shareholders were intended beneficiaries.[7]
Finally, plaintiffs attempt to enforce the "best efforts" clause in the Merger Agreement under traditional principles of promissory estoppel. In order to prevail on a promissory estoppel theory, plaintiffs must show (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance on that promise, and (3) an unconscionable injury. City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 48 (2d Cir.1988) (construing New York law); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 264 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (construing New York law); Swerdloff v. Mobil Oil Corp., 74 A.D.2d 258, 427 N.Y.S.2d 266 (2d Dep't), appeal denied, 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y.S.2d 523 (1980); Wroten v. Mobil Oil Corp., 315 A.2d 728 (Del.1973); Metropolitan Convoy Corp. v. Chrysler Corp., 208 A.2d 519 (Del.1965); Chrysler Corp. v. Quimby, 144 A.2d 123 (Del.1958); Scott-Douglas Corp. v. Greyhound Corp., 304 A.2d 309, 319 (Del.Super.Ct.1973). Each element must be present before a promissory estoppel claim can be sustained. Esquire Radio & Elec. v. Montgomery Ward, 804 F.2d 787, 793 (2d Cir.1986).
Plaintiffs assert that persons other than the promisee may sue under this doctrine, which makes potentially binding any "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person." Restatement (Second) of Contracts at ง 90. Leaving aside for the moment *735 the serious question whether plaintiffs have shown an unconscionable injury separate and apart from loss of the benefit of the bargain, see generally Hoffmann v. Mary Boone Gallery, 708 F.Supp. 78, 82 (S.D.N.Y.1989) (construing New York law), plaintiffs have failed to show that Gulf made a clear and unambiguous promise and that their reliance was reasonable. First, Gulf did not make a clear promise. To the contrary, the Offer to Purchase warned plaintiffs in งง 15 and 16 that, if the FTC sought to enjoin the action, Gulf could terminate regardless of "action or inaction" on its part and regardless of the circumstances. Although Gulf promised to use its "best efforts," the Offer to Purchase, directly after repeating this promise, warned shareholders that there could be "no assurance" that the merger would succeed. Although plaintiffs would like to pretend the statements made in the Offer to Purchase do not exist, promissory estoppel, as an equitable measure, does not allow parties to pick and choose which statements they prefer to hear. Moreover, in the Merger Agreement itself, the "best efforts" clause is explicitly made "subject to" the "conditions out" in Annex I to the Merger Agreement (and thus to the conditions set forth in Section 15 of the Offer to Purchase).[8]See Merger Agreement at งง 1.1, 7.11. Second, plaintiffs have not shown that their reliance on this promise was reasonable, or foreseeable on Gulf's part, because the Offer to Purchase warns them that "no person" has been authorized to make "any representation ... not contained in this Offer to Purchase or in the Letter of Transmittal" and, if given and made, "such ... representation must not be relied upon as having been authorized." (Offer to Purchase at ง 18)
Although these facts alone bar promissory estoppel, equitable relief is inappropriate also for another reason. Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcementโfor example, the Statute of Frauds or a failure of consideration.
Ordinarily the key difference between a promise supported by consideration and a promise supported by a promissory estoppel is that in the former case the detriment is bargained for in exchange for the promise; in the latter, there is no bargain. The detriment is a consequence of the promise but does not induce the making of the promise.
Calamari & Perillo, Contracts, ง 99 at 172 (1970). Here, however, plaintiffs tendered their shares pursuant to a written contractโthe Offer to Purchaseโwhich contained provisions conflicting with the very promise they now claim they wish to enforce: Gulf's supposed promise to use "best efforts" to negotiate with the FTC and reach a settlement satisfying the FTC's objections to the settlement. In such circumstances, plaintiffs cannot sue to enforce the "best efforts" promise under a promissory estoppel theory. Accord Bank of Dade v. Reeves, 257 Ga. 51, 354 S.E.2d 131, 133 (1987) ("These parties entered into a contract the consideration of which was a mutual exchange of promises. The promises exchanged were bargained for. Promissory estoppel is not present.").

3. Implied Good Faith and Fair Dealing Obligation
Apart from the "best efforts" clause, plaintiffs claim that defendants breached an implied covenant of good faith in the Offer to Purchase by negotiating in bad faith with the FTC and by deciding that the FTC's demand for divestiture of Lake Charles threatened loss of a "material portion of ... [Cities] and its subsidiaries, taken as a whole." It is axiomatic that every contract has an implied covenant of good faith and fair dealing. Gelder Medical Group v. Webber, 41 N.Y.2d 680, 684, 363 N.E.2d 573, 577, 394 N.Y.S.2d 867, 871 *736 (1977); United States v. R.J. Reynolds Tobacco Co., 416 F.Supp. 316, 326 (D.N.J. 1976) ("Delaware courts have applied the rule, widely recognized in many jurisdictions, that every contract will be regarded as containing an implied covenant requiring each party to act in good faith and with fairness"); Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del.Ch.1985); Western Natural Gas Co. v. Cities Service Gas Co., 507 P.2d 1236, 1246-47 (Okla.1972), cert. denied, 409 U.S. 1052, 93 S.Ct. 559, 34 L.Ed.2d 506 (1972).
Defendants respond that the language of ง 15(d) bars any attempt to infer a good faith limitation on it. Specifically, they note that ง 15 explicitly provides a "litigation out" in the event of an FTC suit, "regardless of the circumstances" giving rise to the suit, including "action or inaction" by Gulf. Moreover, that section provides that Gulf may terminate if in its "sole judgment," the FTC action would "require the divestiture by Gulf of ... a material portion of the business of [Cities] and its subsidiaries, taken as a whole." Furthermore, the section concludes, "Any determination by the Purchaser concerning the events described in this Section will be final and binding upon all parties." For their part, plaintiffs cite cases in which, even though an objective condition triggers an absolute contract right, the exercise of that right still is scrutinized under a good faith standard. See, e.g., Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1268-69 (10th Cir.1988); Brown v. Avemco Inv. Corp., 603 F.2d 1367, 1378 (9th Cir.1979).
In Tymshare, Inc. v. Covell, 727 F.2d 1145, 1152-52 (D.C.Cir.1984), Judge (now Justice) Scalia recognized that "`[w]hat the intent of the parties was in making the contract must control; it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant.'" 727 F.2d at 1153 (quoting MacDougald Constr. Co. v. State Highway Dep't, 125 Ga.App. 591, 594, 188 S.E.2d 405, 407 (1972)).
But the trick is to tell when a contract has been so drawnโand surely the mere recitation of an express power is not always the test. Sometimes it may suffice, depending upon the nature of the expressed power.... But to say that every expressly conferred contractual power is of this nature is virtually to read the doctrine of good faith (or of implied contractual obligations and limitations) out of existence.
727 F.2d at 1153-54 (emphasis in original). Accordingly, an express power may obliterate implied good faith because of the clause's language or because of the nature of the power. For example, Judge Scalia noted that implied good faith is not erased by a clause which allows an express power to terminate a contract "at will." Similarly, he found that, because the contract at issue in Tymshare stated that the party could change the quota plan "within [its] sole discretion" and an "abuse of discretion" standard is something more than "for any reason ... no matter how arbitrary or unreasonable," the express power by its language did not bar an implied covenant of good faith. Other examples are Big Horn, 852 F.2d at 1267-1269 & n. 14 ("Edison `may ... reduce the minimum' supply of coal"), and Brown, 603 F.2d at 1378, where courts have held that merely conferring an express power is insufficient to bar consideration of whether the party exercised the power in good faith.
At the other end of the spectrum are provisions that give a party an unconditional power to terminate a contract. See, e.g., Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129, 135-39 (5th Cir.) (either party could terminate contract "at any time `with or without cause' on ten days' notice to the other party), cert. denied, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979); District-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1022 (D.C.Cir.1985) (contract provided for payment of money if settlement does not take place "for any reason" and that, if that happens, "no party hereto shall have any liability to the other parties"). Although Ensmann is a case involving the *737 "prevention" doctrine,[9] its discussion aids us here in determining whether ง 15 similarly negates any good faith limitation. In Ensmann, plaintiff argued that Ensmann intentionally prevented settlement from occurring and thus could not be permitted to rely on the nonoccurrence of settlement to avoid liability. The court upheld Ensmann's refusal to perform, noting the rule that, when a contract "authorizes" a party to prevent a condition from occurring, "there is no prevention." 767 F.2d at 1023-24 (quoting Shear v. National Rifle Ass'n, 606 F.2d 1251, 1256 (D.C.Cir.1979)); 5 Williston on Contracts, ง 377A at 235; 3A Corbin on Contracts, ง 767 at 545. "The essential inquiry is whether or not the contract allocated the risk of nonsettlement. By stating that the funds were to be returned to Ensmann if settlement did not occur `for any reason,' the contract allocates to Dumbarton the risk of nonsettlement, regardless of cause. Consequently, there is no prevention." 767 F.2d at 1023-24. Accord Mobile Communications Corp. of America v. MCI Communications Corp., 1985 WL 11574, slip op. at 14-15 (Del.Ch. Aug. 27, 1985) (in contract requiring approval by one party's board of directors, other side assumed risk that fulfillment of the condition precedent would be prevented because management would provide skewed presentation of deal to board). Similarly, in Big Horn, an implied good faith obligation case, the court concluded that, if the contract language shows that the parties "expressly contract for the unconditional right," "the [parties] cannot reasonably expect any special implied protection from terminating the contract." 852 F.2d at 1268.
I read the Offer to Purchase's language to preclude any implied obligation on Gulf's part to negotiate with the FTC in good faith, but not to bar a good faith limitation on Gulf's determination in its "sole judgment" that the FTC's demand would "require the divestiture by Gulf ... of a material portion of the business ... of [Cities] and its subsidiaries, taken as a whole." Section 15 provides that
The foregoing conditions are for the sole benefit of the Purchase and be asserted by the Purchaser regardless of the circumstances giving rise to such condition (including any action or inaction by the Purchaser or Gulf).... Any determination by the Purchaser concerning the events described in this Section will be final and binding upon all parties.
The underlined portion clearly warns plaintiffs that defendants could exercise this option out regardless of the circumstances and regardless of what actions defendants had taken or not taken in negotiating with the FTC. This reading is emphasized at many other points in the Offer to Purchase. In ง 16(c), which details antitrust problems, the Offer to Purchase states, "[t]here an be no assurance that a challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See Section 15 for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions." (emphasis added) The Offer to Purchase emphasized Gulf's freedom in this regard also in ง 11's description of the Merger Agreement where it stated "there can be no assurance that the Merger will take place, since ... it is subject to certain conditions, some of which are beyond the control of Gulf or the Company." *738 (emphasis added) Use of the term "some" necessarily meant plaintiffs were warned that other conditions, like ง 15, were in Gulf's control.
The contract language here is analogous to the unfettered power set forth in Ensmann, MCCA, and Dixon v. Bernstein, 182 F.2d 104, 105 (D.C.Cir.1950) (contract provides "no liability [for the commission] if the sale is not settled"), as opposed to the more limited clauses in Tymshare, Big Horn Coal Co., and Brown. As in Ensmann and MCCA, the parties placed the full risk on plaintiffs that defendants would decide not to contest any FTC threat ("inaction") and, indeed, might decide to encourage it ("action"). No clearer expression of a party's unconditional power is possible. Moreover, this clause was properly cited in the "Conditions" section and thus clearly warned plaintiffs of its significance. Cf. Forward Ind. v. Rolm of New York Corp., 123 A.D.2d 374, 376-77, 506 N.Y.S.2d 453, 454-55 (2d Dep't 1986) (exculpatory clause not enforceable where it is placed in wrong section of the contract). For all these reasons, I find that the Offer to Purchase's language specifically negated an implied good faith obligation by defendants in negotiations with the FTC.
Although this result may seem harsh, the nature of this power shows also why it should be unfettered. Courts applying the Williams Act have long recognized that the tender offeror, because of the quickly changing environment in which it must operate, needs wide latitude over the terms of the offer and may impose as many conditions or terms as it may choose. Indiana Nat'l Bank v. Mobil Oil Corp., 578 F.2d 180, 185 (7th Cir.1978); Kroeze v. Chloride Group Ltd., 572 F.2d 1099, 1105 (5th Cir. 1978); Brill v. Burlington Northern, Inc., 590 F.Supp. 893, 898 (D.Del.1984); Gilbert, 490 A.2d at 1055 (contract breach claim); 1 M. Lipton & E. Steinberger, Takeovers & Freezeouts, ง 1.09[5][b] at 1-100 to 1-101 (1988). Given the inherently unstable prospect of a government challenge and the real possibility of endless delay, it makes sense that the tender offeror should be able to draft a "litigation out" condition so as to have maximum freedom in deciding how to respond to a government challenge.
However, the references to "regardless of the circumstances" and "action or inaction" do not apply to Gulf's "sole judgment" determination whether the FTC action would require divestiture of a material portion of Cities' business, taken as a whole. That determination does not turn on whether Gulf acted in some way or failed to act in another; rather, it is a wholly subjective determination on Gulf's part whether the FTC's demand threatened loss of a "material" portion of Cities' business, taken as a whole. "Sole judgment," like the "absolute discretion" contract term in Tymshare, does not obliterate implied good faith. Rather, it assumes that defendants will, in fact, make a "judgment" in this regard. Case law generally imposes a good faith requirement upon the exercise of subjective discretion in clauses requiring personal satisfaction. See Tymshare, 727 F.2d at 1152-53, and cases cited therein; Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co., 202 F.2d 372, 377 (5th Cir.1953) (termination clause predicated on "satisfaction" of one party enforced "`unless there is an absence of good faith in the exercise of the judgment'") (citation omitted); Fursmidt v. Hotel Abbey Holding Corp., 10 A.D.2d 447, 450, 200 N.Y.S.2d 256, 260 (1st Dep't 1960) (enforcement of "satisfaction" provision requires "honest judgment" of the party). Accordingly, if plaintiffs present sufficient evidence that defendants did not in good faith determine that the FTC's demand to divest the Lake Charles refinery involved a "material" portion of [Cities] business, taken as a whole," plaintiffs will survive summary judgment on this question. In this inquiry, plaintiffs' evidence that defendants did not negotiate in good faith with the FTC is admissible as circumstantial evidence that Gulf in fact did not view the Lake Charles refinery as a material portion of Cities' business, but used the divestiture demand as an excuse to terminate the contract.
Defendants argue that plaintiffs may not present evidence of improper motives for terminating the deal where defendants *739 have "one valid reason" for exercising its right to terminate under the contract, citing Loma Linda Univ. v. District-Realty Title Ins. Corp., 443 F.2d 773, 779 (D.C.Cir.1971); Palombi v. Getty Oil Co., 501 F.Supp. 158, 162 (E.D.Pa.1980); Columbia Christian College, Inc. v. Commonwealth Properties, Inc., 286 Or. 321, 594 P.2d 401, 408 (1979). This very argument was rejected in Big Horn Coal Co., 852 F.2d at 1270. There, as here, defendant sought to prevent inquiry into evidence of other reasons it might have had to invoke the express power in determining whether defendant had utilized the power in good faith. In Big Horn Coal Co., the only valid reason permitting defendant to reduce its purchase obligations under a contract with coal companies was if "environmental reasons" caused problems with the coal company's permits or variance. The court rejected the argument presented here and permitted the coal companies to show that Edison had an oversupply of coal, as evidence of other motives which might "tend[] to prove that Edison's motive for exercising section 3.01 had nothing to do with environmental concerns." 852 F.2d at 1270. Furthermore, the court noted that extrinsic evidence was warranted because the standardโenvironmental reasonsโwas ambiguous. Id.
Similarly here, plaintiffs should be permitted to introduce extrinsic evidence of defendants' other motives for terminating the Offer to Purchase as circumstantial evidence showing that defendants did not believe in good faith that Lake Charles constituted a material portion of Cities' business taken as a whole. Moreover, as the term "material" is ambiguous, the parties may present extrinsic evidence to support their respective interpretations of what it means. Defendants seem to argue that opportunity cost should be included, while plaintiffs seem to be advancing a standard of materiality based on actual loss in dollar terms (value of plant minus resale value).
Defendants cite several cases holding that a good faith obligation will not be read into agreements to negotiate toward a final contract, absent enforceable guidelines. Oil Trading Assoc. Inc. v. Texas City Refining, Inc., 303 F.2d 713, 715-16 (2d Cir. 1962); Candid Productions, Inc. v. International Skating Union, 530 F.Supp. 1330, 1335-338 (S.D.N.Y.1982) (Weinfeld, J.). See also Reprosystem, B.V., 727 F.2d at 264; Jillcy Film Enter., Inc. v. Home Box Office, Inc., 593 F.Supp. 515, 520 (S.D. N.Y.1984). However, those cases deal with the so-called "agreement to agree," which is less an agreement than a stage of negotiations and which courts refuse to recognize as imposing limitations and obligationsโ i.e., which courts often refuse to recognize as a contract. See Candid Prods., 530 F.Supp. at 1334-35. We deal here with a fully enforceable contract with complete provisions on all essential subjects. To the extent that defendants are arguing that courts cannot second-guess negotiating tactics, they are incorrect. Courts are often called upon to determine whether a party negotiated in good faith. For example, courts must determine whether an insurance company failed to settle a personal injury lawsuit in good faith and instead subjected its insured to liability above his coverage. See Gordon v. Nationwide Mutual Ins. Co., 30 N.Y.2d 427, 285 N.E.2d 849, 334 N.Y.S.2d 601 (1972). Moreover, as I have held, the evidence will not be admitted for the purpose of determining whether defendants negotiated in good faith, but rather as circumstantial evidence of whether defendants in good faith determined that the Lake Charles refinery was a material portion of Cities' business.
Nor is the phrase "material" so vague as to be unenforceable. Compare Pinnacle Books, Inc. v. Harlequin Enterprises, Ltd., 519 F.Supp. 118, 122 (S.D.N.Y. 1981) (holding "best efforts" clause in agreement to agree so vague as to be unenforceable); Mocca Lounge, Inc. v. Misak, 94 A.D.2d 761, 763, 462 N.Y.S.2d 704, 706-7 (2d Dep't 1983) (in dictum observing that a best efforts clause is unenforceable unless the contract contains standards by which to measure party's performance) with Proteus Books Ltd., 873 F.2d at 508-09 (contract term that party perform its services with "due professional skill and competence" *740 enforceable as "reference to external, ascertainable standards imparts a reasonable degree of certainty to the phrase"); Young v. Zwack, Inc., 98 A.D.2d 913, 914, 471 N.Y.S.2d 175, 177 (3d Dep't 1983) (meaning of defendant's promise to "cover" additional costs ascertainable from terms of contract and prior dealings). Although the requirement here that the FTC demand divestiture of a "material" portion of Cities' business, "taken as a whole" is ambiguous, it can be interpreted by reference to external, ascertainable standards of materiality. By its language, it requires comparison of the magnitude of the loss to the value of Cities' business to defendants "taken as a whole." The magnitude of materiality can be determined by reference to such tests as opportunity cost, replacement value and the like. That the parties differ over the applicable objective standard does not make the clause unenforceable. Rather, it means they must present evidence in support of their competing standards. I now consider that evidence as well as the evidence of whether defendants decided in good faith that the FTC's divestiture demand met that standard of materiality, to see if there are material issues of fact which would preclude summary judgment on plaintiffs' contract claim.
As direct evidence that Gulf did consider Lake Charles a material asset of Cities, Gulf cites Chairman Lee's testimony to the effect that, from the very beginning of the merger talks, Lake Charles was of special interest because of its ability to process low cost heavy sour crude oil into unleaded gasoline. (Lee Dep. 16-17) Gulf's outside counsel Booker has testified that he was specifically instructed by Gulf's general counsel Luton not to agree to the divestiture of Lake Charles under any circumstances. (Booker Dep. 91-92) Moreover, Cities Chairman Waidelich in an interview confirmed the importance of Lake Charles in the integration process with Gulf, as did Cities itself in its response to the FTC's demand for a specification of benefits. See p. 6. All of Gulf's directors confirm the importance of Lake Charles as does Campbell of the FTC who specifically remembers it being described by Gulf's representatives as the "crown jewel" of the deal. Scattered throughout the parties' papers on this motion are references to the importance of Lake Charles, particularly in minutes of Gulf's meetings with ratings agencies. See, e.g., PX 97 at 4. Finally, when defendants were considering whether to terminate the deal, defendants drafted a listing of costs Gulf would entail if it had to divest Lake Charles. They arrived at a total of $1 billion by including lost opportunity costs. Lee in his deposition admitted that this figure was "soft" and offered a lower figure of approximately $500 million. Given that defendants had valued the entire deal at approximately $5 billion, this evidence suggests defendants acted in good faith in determining that Lake Charles was a material portion of Cities business, taken as a whole.
Plaintiffs question whether Lake Charles was so important to Gulf. First, they note that Lee stated at one point in his deposition that it was "one of the cons." (Lee Dep. 271) However, this comment described Cities' entire roster of downstream assets, and does not mean that Gulf had no interest in the Lake Charles refinery. See Lee Dep. 271. Plaintiffs argue also, and defendants do not contest, that Gulf was losing money on its refining and marketing operations and was seeking to reduce refining capacity. See p. 719. Second, plaintiffs provide an affidavit by Martin Lipton stating that Gulf representatives told him that they ascribed "no value" to the Lake Charles refinery. (Lipton Aff. ถ 6) Again, this statement might be a reflection of the lower profitability of Cities' downstream assets; given the ambiguity, however, one at least reasonable inference from it is that Gulf in fact ascribed "no value" to the Lake Charles refinery. Third, plaintiffs present other evidence from which one could infer that Gulf's interest in Lake Charles was not genuine. For example, Gulf valued Cities' Lake Charles refinery at $140 million, below Gulf's lawyer Luton's benchmark of $200 million for materiality; if that is true, how could Lake Charles "cost" Gulf approximately $500 million, as Gulf would later claim? Moreover, *741 plaintiffs urge that Lake Charles' heavy sour crude capabilities could not have been important because Gulf has never sought to equip one of its own refineries to process heavy sour crude. Finally, plaintiffs question whether Gulf underrated the benefits of selling Lake Charles, including reducing debt and cutting refinery production, long-term goals Gulf had considered if the merger went through. All told, while plaintiffs' showing is hardly powerful, they have shown sufficient issues of material fact regarding Gulf's good faith in valuing Lake Charles to survive summary judgment.
Plaintiffs' circumstantial evidence, that Gulf promised to divest any downstream assets necessary to secure FTC approval and that it failed to negotiate in good faith with the FTC, is pertinent to whether Gulf believed Lake Charles was a material portion of Cities' business because it tends to show that Gulf in fact was willing to divest and, thus, that Lake Charles was not "material," and demonstrates as well that Gulf, by negotiating in bad faith, was not really interested in Lake Charles but seized on the FTC's demand as a way to terminate the deal. Even though this evidence will not be presented to prove a contract violation arising from Gulf's bad faith in negotiating with the FTC, but merely as circumstantial evidence of Gulf's bad faith determination that Lake Charles was material, defendants offer an array of arguments why such evidence should not be received. Defendants would bar evidence of Gulf's alleged secret representation to Cities that it would divest anything necessary to secure FTC approval, including Lake Charles, see pp. 721-22, on the ground that, because at least two of the Jones plaintiffs, Foster Bam and Milton Edgerton, Jr., were on Cities' board of directors and thus had inside information which they failed to disclose to the public, they deliberately omitted a material fact under the materiality standard of Basic v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and the agreement itself is thus void under ง 29(b) of the 1934 Act. Section 29 of the 1934 Act provides, in pertinent part, that
[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract....
15 U.S.C. ง 78cc(b). However, as plaintiffs correctly point out, there was no agreement, merely a representation. In any event, even assuming arguendo that this was an agreement, ง 29 does not render the agreement void, but rather voidable at the option of the innocent party. Securities and Exchange Commission v. Levine, 881 F.2d 1165 (2d Cir.1989); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970).
In a variation on this argument, defendants now claim that plaintiffs are estopped to rely upon the alleged promise to divest any downstream assets because Cities failed to disclose it in filings with the FTC. According to defendants, Cities in its June 22, 1982 Schedule 14D-9 filing with the SEC represented that the written merger agreement and tender offer were the sole agreements between the parties, and that there were "no other material contracts, agreements, arrangements, or understandings" between Gulf and Cities. (DX 21 at 3) Furthermore, although Cities was required by SEC Schedule 14D-9 to list the reasons for its recommendation to its shareholders to tender, Cities did not list this representation as such a reason. In support of their claim, defendants cite cases where courts held that parties were estopped to make representations inconsistent with statements in SEC filings. See Lewis v. Atlas Corp., 158 F.2d 599 (3d Cir.1946); Hagerman v. Yukon Energy Corp., 839 F.2d 407 (8th Cir.), cert. denied, ___ U.S. ___, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988); York v. Georgia Pacific Corp., 585 F.Supp. 1265 (N.D.Miss.1984). Defendants concede that plaintiffs other than Bam and Edgerton cannot be bound by the actions of Cities. Moreover, even assuming an estoppel otherwise might be present here, Schedule 14D-9 filings usually focus on reasons for recommending a merger to shareholders, *742 not factors which would simply make a merger more likely. Therefore, failure to mention the alleged secret agreement, which was only a factor making the deal more likely and not one making it more advantageous to Cities' shareholders, would not be significant.
Similarly, defendants seek to estop plaintiffs (or at least Bam and Edgerton) from disavowing Waidelich's statements, later submitted to the FTC, that Lake Charles was a "major benefit" of the transaction and that the parties expected antitrust objections only concerning gas marketing, and from disavowing Kantor's statements, made during negotiations with the FTC, supporting Gulf's refusal to extend the ten-day HSR waiting period and chastising the FTC for demanding divestiture of Lake Charles. See pp. 726-27. The short answer to defendants' arguments is that these statements, if they say what defendants claim and if they were made, will provide ammunition to use on cross-examination of plaintiffs' witnesses. However, these statements do not estop plaintiffs from presenting evidence of defendants' alleged lack of interest in Gulf's downstream assets and bad faith bargaining posture with the FTC to show, in turn, that defendants failed to decide in good faith that Lake Charles was a material asset.
To the extent that defendants seek to raise an unclean hands defense because Bam and Edgerton failed to divulge Gulf's commitment to Cities shareholders, such a defense is unavailable in a contract action for damages. See Pecorella v. Greater Buffalo Press, Inc., 107 A.D.2d 1064, 1066, 486 N.Y.S.2d 562, 563-64 (4th Dep't 1985). However, this defense may be available as to the securities fraud claims. See, infra, pp. 753-54.
Defendants challenge also every theory advanced by plaintiffs as to how Gulf might have negotiated a settlement with the FTC: that Gulf could have extended the ten-day HSR waiting period without incurring liability to shareholders; that Gulf should have offered a Pasco remedy before July 29; and that, even after the FTC sued to enjoin, Gulf should have agreed to a divestiture of Lake Charles or a combination of its refineries because they were not material. Defendants argue that the FTC would not have settled under any circumstances within the ten-day HSR period; that the FTC would not have accepted a Pasco remedy; that Gulf was not required to offer divestiture of Lake Charles before July 29 because the FTC never demanded such divestiture until August 3; and that Gulf could not legally delay its purchase of the tendered shares past the ten-day HSR period. Defendants take issue also with plaintiffs' claim that Gulf improperly triggered the ten-day HSR period prior to serious negotiations with the FTC and plaintiffs' other assertions that Gulf obstructively changed lawyers, etc. I have described these arguments as well as their factual support in Section I, and will not repeat them again. Nor need I resolve these claims because I have already determined (i) that defendants as a matter of law owed plaintiffs no duty to negotiate in good faith with the FTC, and (ii) that there is a triable issue whether Gulf violated the one duty it did owe, the duty to determine in good faith whether the FTC's demand for sale of Lake Charles involved a material asset.

* * * * * *
To summarize, I hold as a matter of law that defendants owed plaintiffs only a duty to determine in good faith whether Lake Charles was a material portion of Cities' business. As to that claim only, defendants' motion for summary judgment is denied because there are significant facts in dispute. Compare Richard Short Oil Co. v. Texaco, Inc., 799 F.2d 415, 422 (8th Cir.1986) ("mere conclusory allegation of bad faith would be insufficient to defeat a directed verdict motion") with Canyon Land Park, Inc. v. Riley, 575 F.2d 550, 552-53 (5th Cir.1978) (denying summary judgment on implied good faith obligation where plaintiffs had adduced admissible evidence of bad faith). Plaintiffs may introduce evidence of Gulf's alleged bad faith negotiation with the FTC as circumstantial evidence that defendants did not find in *743 good faith that Lake Charles was a material asset, but rather used it merely as an excuse to terminate the deal.

B. Fraud Claims

The Class plaintiffs claim defendants violated ง 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Rule 10b-5 makes it unlawful for any person
(a) to employ any device, scheme, or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. 240.10b-5. Both the Class plaintiffs and the Jones plaintiffs claim also that defendants violated ง 14(e) of the Securities Exchange Act of 1934 (known as the Williams Act) which provides:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.
15 U.S.C. ง 78n(e). The elements under ง 14(e) and Rule 10b-5 are the same, except that under ง 14(e) the violations must be "in connection with" a tender offer, rather than a purchase or sale of securities. See, e.g., Gulf & Western Ind., Inc., 476 F.2d at 696; Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir.1969). Finally, the Jones plaintiffs assert a common law fraud claim.
Defendants first challenge the standing of Cities' call option holders, who number approximately half the Class plaintiffs, to maintain an action under งง 10(b) and 14(e). Second, defendants contend that plaintiffs fail to allege material misrepresentations sufficient to invoke the protection of the securities laws.

1. Standing for Option Holders

The issue of whether stock option purchasers have standing to sue under ง 10(b) has divided courts. Compare Deutschman v. Beneficial Corp., 841 F.2d 502 (3d Cir.1988) (purchasers of call options have standing to assert claims of affirmative misrepresentation), cert. denied, ___ U.S. ___, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989); Tolan v. Computervision Corp., 696 F.Supp. 771, 774-75 (D.Mass.1988) (same); In re Digital Equipment Corp. Securities Litigation, 601 F.Supp. 311 (D.Mass.1984) (same); Backman v. Polaroid Corp., 540 F.Supp. 667 (D.Mass.1982) (same); O'Connor & Assoc. v. Dean Witter Reynolds, Inc., 529 F.Supp. 1179 (S.D. N.Y.1981) (option holders have standing to sue corporate insiders and their tippees who themselves traded in options based on inside information); Lloyd v. Industrial Bio-Test Laboratories, 454 F.Supp. 807 (S.D.N.Y.1978) with Laventhall v. General Dynamics Corp., 704 F.2d 407 (8th Cir.) (insiders trading in corporate stock owed no duty to disclose to purchaser of call operation), cert. denied, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983); Starkman v. Warner Communications, 671 F.Supp. 297 (S.D.N.Y.1987) (no standing for option holders for defendant's misstatements); Bianco v. Texas Instruments, 627 F.Supp. 154 (N.D.Ill.1985) (same). Scholars too have vetted the issue. E. Sacksteder, Securities Regulation for a Changing Market: Option Trader Standing Under Rule 10b-5, 97 Yale L. Journal 623 (1988); Note, Private Causes of Action for Option Investors under SEC Rule 10b-5: A Policy, Doctrinal, and Economic Analysis, 100 Harv.L.Rev. 1959 (1987).
This issue has been fully explored by both courts and scholars, and I see no reason to retrace their steps here. I find *744 persuasive and relevant Chief Judge Gibbons' analysis in Deutschman, where the court found that option holders complaining of affirmative misstatements have standing. Affirmative misstatements are the only kind at issue here.[10] The definition of "security" in the 1934 Act expressly includes options. Since 1982, the definition of security in ง 3(a)(10) of the 1934 Act has read: "[T]he term `security' means ... any put, call, straddle, option, or privilege on any security ..." 15 U.S.C. ง 78c(a)(10). Cases involving allegations of insider trading that found option holders had no standing, see, e.g., Laventhall and Starkman, relied on the absence of a nexus between the nondisclosure and the market for options. Because the insider trades in stock, rather than options, the courts reasoned, his alleged illegal gain is too remote from plaintiff's loss in the options market. As Deutschman points out, however, "no Supreme Court case and no Court of Appeals case has ever imposed a transactional nexus requirement in a ง 10(b) affirmative misrepresentation case." 841 F.2d at 507 (emphasis added).
Finally, as to policy arguments advanced in favor of denying standing, i.e., that option holders are gamblers in a highly speculative market, and that, because corporations cannot control the number of options issued, their liability would be potentially limitless, I agree with the Deutschman court that these arguments are more appropriately addressed to Congress. In any event, they have no force when it comes to affirmative misrepresentations. Although different investments involve different degrees and kinds of risk, "[n]o investor chooses to take the additional risk of fraud." 97 Yale L. Journal at 633. Concerning the fear of potentially unlimited liability, the Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) rule, requiring that a plaintiff have bought or sold in reliance on the misstatements, ensures that liability will never be limitless. Deutschman, 841 F.2d at 507. I thus find that Class plaintiffs who purchased Cities call options during the period in question have standing under ง 10(b).
Defendants claim also that the option holders have no standing to sue under ง 14(e) of the Williams Act. Defendants argue that ง 14(e) has as its "sole purpose" the "protection of investors who are confronted by a tender offer," Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), and that this necessarily excludes individuals purchasing options during the tender offer period. See also Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975) (ง 14(e) is designed "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond with adequate information") (emphasis added). Although, as noted above, many cases have treated the options trader's standing under ง 10(b), only one case has considered whether options traders have standing to sue under ง 14(e) of the Williams Act, Judge Lasker's opinion in O'Connor. In O'Connor, the options trading plaintiff sued corporate insiders, alleging that they tipped information of an imminent tender offer to others who then traded in the options market. Although O'Connor concerned insider trading, and relied on Rule 14e-3's prohibition against insider trading, including explicitly trading in options markets, 529 F.Supp. at 1189-93 & n. 6, Judge Lasker's determination that an options trader had standing assists us here. The SEC's inclusion of options markets within Rule 14e-3 shows that the SEC believes the Williams Act is intended to protect such investors. The SEC's interpretation of securities laws is entitled to substantial deference. See 529 F.Supp. at 1190-91; see also Quern v. Mandley, 436 U.S. 725, 743 n. 19, 98 S.Ct. 2068, 2079 n. 19, 56 L.Ed.2d 658 (1978).
The plaintiff in O'Connor argued that the tender offer affects an options trader's investment decision the same way it affects *745 a target shareholder's and that plaintiff would become a shareholder if the options were exercised. 529 F.Supp. at 1189. Similarly here, plaintiffs assert that they purchased call options in reliance on defendants' affirmative misrepresentations. Although ง 14(e) unlike ง 10(b) does not use the term "security" and thus the 1934 Act's definition of security which encompasses options does not apply to ง 14(e), the reasons for holding tender offerors liable under ง 10(b), described above, apply to ง 14(e). There, as here, defendants' alleged affirmative misrepresentations caused plaintiffs' losses. And, as the options market's price for Cities call options is intimately connected to the stock market's price for Cities shares, it was reasonably foreseeable that defendants' affirmative misrepresentations would affect plaintiffs. It is as appropriate to the options markets as to the stock market to say that defendants "chose to speak, and in speaking they were not free to lie." Deutschman, 841 F.2d at 506.
Although dictum in Rondeau and other decisions states that the Williams Act was designed primarily to protect tendering shareholders, there is no indication the courts intended those pronouncements to exclude others. For example, in recognition of the Williams Act's broad remedial purpose to protect investors in takeover situations, both the Ninth Circuit and the Second Circuit have held that nontendering shareholders have standing under ง 14(e). Plaine v. McCabe, 797 F.2d 713, 717-8 (9th Cir.1986); Electronic Specialty Co., 409 F.2d at 944-46. It is also worth noting that the Supreme Court, in its most recent discussion of the Williams Act, used the term "investor" rather than shareholder to describe those the statute was intended to protect. Piper, 430 U.S. at 35, 97 S.Ct. at 946. In sum, I conclude that the Class plaintiffs who purchased Cities' call options also have standing under ง 14(e).

2. Materiality Standard
In Basic, 108 S.Ct. 978, the Supreme Court adopted the standard of materiality set forth in TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (construing the materiality requirement for ง 14) for ง 10(b) cases. For a fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Basic, 108 S.Ct. at 983 (quoting TSC Indus., 426 U.S. at 449, 96 S.Ct. at 2132). The Supreme Court specifically endorsed Judge Friendly's test for materiality set forth in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.1968) (in banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969):
[W]hether facts are material within Rule 10b-5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.
Briefly, plaintiffs' claims of misrepresentation are threefold:
(1) Plaintiffs aver that, at the July 13 Board meeting, defendants had a significant change of heart regarding the merger. As a result of mounting bad news, defendants were no longer as interested in the transaction as before and put the decision whether to proceed "in limbo." Because defendants had earlier represented that they would use their "best efforts" to effect the merger and otherwise indicated strong interest in consummating the deal, they had a duty to disclose this change of heart. If defendants had done so on July 13, plaintiffs still could have withdrawn from the deal, July 13 being the last day to withdraw tendered shares.
(2) After the FTC sued to enjoin the merger, defendants issued a press release on July 30 stating that they would "contest the FTC action vigorously." According to plaintiffs, defendants did not vigorously contest the FTC action because they wanted to pull out of the deal. Thus, this statement was a material misrepresentation. The tendering shareholders would *746 infer from this misrepresentation and indeed the post-July 13 sequence of events that defendants in fact had soured on the deal before July 13.[11] Of course, Class plaintiffs who purchased call options and shares after July 30 can show direct reliance on this misrepresentation.
(3) Plaintiffs claim that, at the deal's inception, defendants fraudulently misrepresented to Cities that they had studied the antitrust implications of the merger and were willing to divest any downstream assets; in reality, defendants were unwilling to divest the Lake Charles refinery. Plaintiffs assert that as a result, Cities' Board generally recommended the merger and the tender of shares.
As for the first claim, that defendants had a duty to reveal their "change of heart" on July 13, defendants contend that they had no such duty because they warned plaintiffs from the inception of the tender offer that consummation was highly uncertain.
Before a fact is determined to be material, defendants must be found to have a duty to disclose. Basic, 108 S.Ct. at 987 n. 17 ("To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5"); Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 730 n. 8 (2d Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988) and cases cited therein. However, when a corporation "voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events." Greenfield v. Heublein, Inc., 742 F.2d 751, 758 (3d Cir.1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); Ross v. A.H. Robins Co., 465 F.Supp. 904, 908 (S.D.N.Y.), rev'd on other grounds, 607 F.2d 545 (2d Cir. 1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).
Plaintiffs claim that, at the beginning of the transaction, defendants made a series of public statements expressing Gulf's enthusiastic commitment to the acquisition. In a Wall Street Journal article, Gulf Chairman Lee was quoted as saying that the agreement with Cities was a "unique opportunity" for the company to "realize long-term strategic goals." (PX 27) One week later, Lee wrote to Gulf shareholders stating that "[W]e view this transaction with a great deal of optimism." (PX 163) The text of this letter was included in a June 28 press release. Plaintiffs cite similar comments from Hammer. (PX 41; DX 14) Significantly, according to plaintiffs, Gulf in the Merger Agreement represented that it would use its "best efforts" to conclude the transaction, a comment repeated in the offer to Purchase. The Merger Agreement similarly referred to both sides using "all reasonable efforts."
Defendants counter that the Offer to Purchase contained many statements explicitly warning that the merger was an "if" from the outset. Section 11 of the Offer to Purchase states that: "The Merger is subject to the satisfaction of certain conditions" and that "there can be no assurance that the Merger will take place," since it is subject to certain conditions, "some of which are beyond the control of Gulf or the Company." Section 16(a) states: "The Purchaser's obligation under the Offer to purchase and pay for shares is subject to certain conditions." Section 16(b) also states that "In the event that it is asserted that one or more state takeover laws is applicable to the Offer ... the Purchaser might be unable to purchase or pay for shares tendered pursuant to the Offer.... See Section 15 for certain conditions of the Offer." Section 16(c) states: "There can be no assurance that a challenge on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See Section 15 for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions." Finally, ง 15 gave Gulf broad freedom to decide in its "sole judgment" whether one of the conditions out had occurred "regardless of the circumstances" *747 and "regardless of any action or inaction" by Gulf.
Defendants deny both that they had a duty to disclose a change of heart about a contingent event, and that such a change was material under the Basic standard. A recent Second Circuit decision, Kronfeld, 832 F.2d 726, demonstrates that even contingent plans of a company may be sufficiently material to warrant disclosure and that general advance warnings of the potential for change may not be enough to cure a later omission. The Kronfeld panel first noted that a "strong showing ... generally must be made to justify resolving the question of materiality under the securities laws by way of" summary judgment. 832 F.2d at 731 & n. 9 (citing TSC Indus., 426 U.S. at 450, 96 S.Ct. at 2133; Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). In Kronfeld, defendant Trans World Corporation ("TWC") directed Goldman Sachs to study financial and structural options open to TWC. One of seven such alternatives was termination of Trans World Airlines ("TWA") as a subsidiary. While Goldman Sachs was considering the termination option, TWA issued a prospectus. Although the prospectus warned that there may be "other arrangements between TWA" and TWC, and said there were "no assurance[s]" about changes in their relationship, the prospectus gave no indication that terminationโthe end of any "arrangements"โwas under study. 832 F.2d at 730. Later, when TWC did terminate TWA, plaintiffs sued, arguing that TWA should have disclosed that termination was being considered. TWA moved for summary judgment, maintaining that when it issued its prospectus TWC's board had not yet been presented with the Goldman Sachs reportโand hence, the termination option, and thus was under no duty to disclose it. Judge Weinfeld granted summary judgment.
Reversing, the Second Circuit found that summary judgment was inappropriate because "contingencies inextricably bound up with a company's fortunes need not be certainties to qualify as material." 832 F.2d at 735. In particular, the court rejected defendants' argument that the termination proposal was not material because it had not yet reached the Board. 832 F.2d at 735. Given that "the TWA prospectus discussed in some detail the relationship between TWA and TWC," the Court found that failure to disclose the possibility of terminating the relationship was materially misleading. Although the court agreed with the view of Judge Friendly in Electronic Specialty, 409 F.2d at 951, that the opinion of one director favoring termination would not be enough to show materiality, the court cited other evidence to show that the company's prospectus was misleading when it failed to mention the possibility of termination.
A recent case in this district has also examined this question. Kamerman v. Steinberg, 123 F.R.D. 66 (S.D.N.Y.1988), involved an alleged scheme to "greenmail" the Walt Disney Company. On Friday, June 8, 1984, defendant Saul Steinberg publicly announced a tender offer for Disney. Over the weekend, however, Steinberg negotiated an agreement whereby Disney would repurchase his stock and Steinberg would withdraw the tender offer. Even though Disney's board had yet to approve the deal and "standstill" agreements remained to be worked out, Judge Motley found that, under the Basic test,
the weekend talks were neither idle conversation nor mere exploratory overtures: a price was set and the important terms of the transaction agreed upon.... [D]iscussions between two parties over the sale of a large block of stock assume particular relevance when the stockholder's desire to sell represents a sharp break from his prior public positions.
123 F.R.D. at 71. Judge Motley denied summary judgment, finding that this "sharp break" from past public positions was a material development that should have been disclosed.
Defendants are certainly correct that the Offer to Purchase warned plaintiffs that, if certain events occurred (as enumerated in ง 15), defendants could terminate. But those statements simply cannot serve as a blanket caveat emptor such *748 that defendants owed plaintiffs no duty to advise them later if termination became a substantially greater possibility because of some previously undisclosed fact or condition. When objectively verifiable factors cause a significant change in a party's attitude toward a mergerโa "sharp break from ... prior public positions," Steinberg, 123 F.R.D. at 71โthe securities laws may require that previously disclosed intentions be corrected. The question here is whether defendants' view of the transaction changed so substantially on July 12-13 as to render their earlier statementsโnamely, that they would use their best efforts but that certain contingencies might prevent consummationโmaterially misleading.
Viewed in the light most favorable to plaintiffs, the evidence shows that, by July 13, Gulf's support for the deal had waned and termination became more likely. Much of the evidence already has been discussed in Section I, so I will only highlight it here. Plaintiffs have adduced evidence that
(1) Gulf's engineers disputed Cities' figures on its oil reserves, the very assets Gulf had sought;
(2) Gulf's offer of $63 a share generated substantial criticism from Gulf's shareholders, market analysts and rating agencies;
(3) Gulf was threatened with the loss of favorable tax provisions it had counted on for the merger; and
(4) The collapse of OPEC price meetings on July 10 had forced Gulf to revise predictions that oil prices would rise.
Moreover, the July 13 Board meeting, also when seen in the light most favorable to plaintiffs, suggests that Gulf's view of the attractiveness of the deal may have changed. Although the parties have spent inordinate time and space contesting the meaning of Lee's deposition testimony about the July 13 meeting, see p. 723, both sides agree that at least one director, Singer, advocated terminating the deal and that the Board discussed whether the oil shortfall warranted termination. When read favorably to plaintiffs, the evidence demonstrates that the Board for the first time was considering ending the deal (as illuminated by Lee's comment, "if we proceeded with this merger" (emphasis added)), but decided to put "the matter in abeyance for the time being" pending further information on the oil reserve shortfall. Moreover, plaintiffs note that July 8 notes of Bruce Evans, one of Gulf's outside counsel, suggest that Gulf actually considered whether to disclose the oil reserve shortfall, as follows:
1. Should raise issue (defense to waste of corp[orate] assets claims).
2. Announce prior to July 13?
3. Don't indicate course of action if reserves are wrong.
4. Present plan would be deferral rather than amended offer.
(PX 185) Although plaintiffs admit that the meaning of these notes is far from clear, one interpretation is that Gulf was considering whether to announce the alleged oil shortfall prior to July 13, but had decided not to.
Given these factsโas well as other circumstantial evidence cited above and post-July 13 actions by defendantsโa reasonable jury could conclude that, by July 13, defendants had made a sharp break from their past commitment to try to effect the merger, and now were seeking to terminate the deal. One could argue that the oil asset dispute arguably fell within the "condition out" for material misrepresentations by Cities and that the shareholders had been warned of this contingency. But there is a world of difference between the mere possibility of some misrepresentation by Cities and the fact that Gulf had uncovered an alleged shortfall in oil reserves that even Gulf calls "an engineering opinion difference." If plaintiffs had known that defendants were growing concerned about the value of the transaction, it would have been a material factor in their decision whether to withdraw their stock.
The information about the oil reserves shortfall is distinguishableโat least at this pointโfrom the type of information in Staffin v. Greenberg, 672 F.2d 1196 (3d Cir.1982), which, although material, was subject to rapid change such that any announcement *749 would have been premature and more confusing than helpful. Although defendants state they planned further analysis of the oil reserve shortfall, plaintiffs claim no further analysis by Gulf was done. Defendants speculate also that a July 13 disclosure of "limited intent" would have been simply confusing. In the words of Judge Motley, "[a]s is customarily true with disclosure, the truth would have been sufficient." 123 F.R.D. at 72. It would have been sufficient for defendants to have disclosed that there was a difference of opinion about Cities' claimed oil reserves and that Gulf was considering resort to the right to terminate the deal under ง 15(e) of the Offer to Purchase if Cities had in fact misrepresented its oil reserves.[12] Accordingly, defendants' motion for summary judgment on this claim must be denied.
Regarding plaintiffs' allegations of post-July 13 material misrepresentations, the Jones plaintiffs and the tendering shareholders in the Class argue that they may use evidence that defendants negotiated in bad faith with the FTC as circumstantial evidence from which one could infer that defendants before July 13 had had a "sharp break" in attitude toward consummation of the merger. So they may. However, there is also a suggestion in the Jones brief that tendering shareholders may sue directly for alleged post-July 13 material misrepresentations, even though they could not withdraw their shares after July 13. To support this claim, they argue that the withdrawal period should be extended if the tender offeror must disclose a new representation, see Newmont Mining Corp. v. Pickens, 831 F.2d 1448, 1452 (9th Cir.1987), and the jury might agree that defendants should have issued a statement on July 13 regarding Gulf's changed attitude toward the deal: If the corrective statement had been issued, and if the withdrawal period had been extended, the tendering shareholders would have been in a position to be damaged by defendants' post-July 13 misstatements and omissions, if such they were and if they would have been made after the corrective statement that lengthened the withdrawal period ab initio, and if these plaintiffs had not withdrawn their tenders. The short answer to this convoluted argument is that it is utterly speculative and therefore cannot provide a basis for relief here.
Those who purchased Cities call options and shares after July 13 may assert claims that defendants made affirmative misrepresentations from July 13 and until the deal was terminated. Other than the continuing alleged failure by defendants to disclose their changed attitude toward the merger, these plaintiffs claim that a July 30 press release issued by defendants shortly after the FTC had sued to enjoin the deal and the Gulf Board voted to postpone purchase of the shares was materially misleading. The press release reads in pertinent part:
Gulf Oil Corporation announced today that its subsidiary, GOC Acquisition Corporation, had given notice, pursuant to the terms of its Offer to Purchase dated June 22, 1982, that it has postponed purchase of and payment for up to 41,500,000 shares of Common Stock of Cities Service Company pursuant to its tender offer.
The postponement is of indefinite duration and was taken in light of the Temporary Restraining Order entered yesterday *750 by the United States District Court for the District of Columbia forbidding Gulf and GOC from purchasing any shares.
GOC stated in its notice that the action to postpone was taken "without prejudice to GOC's rights to terminate the offer at any time pursuant to the terms of the Offer to Purchase either (a) on the basis of facts or circumstances now known or in existence or (b) on the basis of facts or circumstances subsequently becoming known or coming into existence."
* * * * * *
Gulf stated that it intends to contest the FTC action vigorously but at the same time seek to discuss with the FTC whether there is a reasonable basis for a prompt settlement of the action. The spokesman pointed out that Gulf could determine to terminate the offer at any time during the course of the litigation or the settlement discussions.
Plaintiffs contend that the promise to contest the FTC action "vigorously" was not true: defendants had no intention of contesting the FTC action and, in point of fact, did not contest the action in a "vigorous" fashion. In support of this argument, plaintiffs refer to Campbell's testimony that he believed Gulf had decided not to vigorously contest the preliminary injunction, and that Gulf was undecided on what to do. See pp. 724-25. Defendants have adduced contrary evidence from an FTC lawyer that Gulf did fight the TRO. See p. 726. Defendants have also explained that statements made to Campbell about a preliminary injunction not being such a bad thing meant only that a preliminary injunction was not so bad compared to the long delays that an FTC administrative proceeding would entail. Defendants contend also that, even if they did not contest the FTC action vigorously, the press release was not misleading because it specifically referred the reader to Gulf's right under ง 15 of the Offer to Purchase to terminate in case of a FTC action "regardless of the circumstances" and regardless of any action or inaction on Gulf's part. Although I have found earlier that ง 15 expressly recognized that Gulf might not contest an FTC action, I find that there is a material factual issue whether the mere reference to ง 15, especially when coupled with the statement that Gulf would contest the FTC action vigorously, would lead a reasonable investor to believe that Gulf then intended to contest the action vigorously, such that that press release was materially misleading if, in fact, Gulf did not then so intend. Accordingly, as there are factual issues in dispute, defendants' motion for summary judgment on this securities fraud claim is also denied.
Plaintiffs' third securities violation, in its present incarnation,[13] relates to Gulf's supposed oral representation, reported by Waidelich and Lipton, that Gulf had thoroughly studied the antitrust issues in the proposed merger and that it would divest any downstream assets necessary to solve antitrust problems. See pp. 721-22. Plaintiffs claim this representation was false and misleading because Gulf had not adequately studied the antitrust problems and because Gulf Chairman Lee allegedly had decided that Gulf would not agree under any circumstances to divest the Lake Charles refinery. Plaintiffs claim that this alleged misrepresentation of an intent to divest to the extent necessary for FTC approval was, in the words of Cities' Chairman Waidelich, a "prerequisite" to the Cities Board's "willingness to recommend it to our shareholders." (Waidelich Aff. ถ 5) Accordingly, because those shareholders relied on Cities' recommendation, they relied, albeit unknowingly, on Gulf's alleged misrepresentation. Plaintiffs thus claim affirmative misrepresentation, not omission. Plaintiffs claim also that this misrepresentation was embodied in ง 16(c) of the Offer to Purchase which reported Gulf's belief that, although there might be FTC *751 scrutiny of the "petroleum refining and marketing operations," Gulf "believes that the combined petroleum refining and marketing operations of Gulf and the Company do not create a likelihood of antitrust challenge such as would prevent the consummation of the Offer." According to plaintiffs, ง 16(c) was a false misrepresentation because Gulf in fact had no intention of divesting a refinery. As discussed more fully in section I, defendants have their own version of these events, contending that they never said Gulf would be willing to divest without limit, and that both parties all along expected divestiture only in gas marketing. See pp. 720-21. Because of admittedly serious factual disputes between the parties on the underlying events, defendants do not contend that there are no material issues of fact as to this alleged securities violation. Rather, they argue that the allegedly misleading statements to Cities were never intended to be disclosed to the investing public, and therefore no reliance can be shown; alternatively, they contend that the Offer to Purchase precludes a presumption of reliance on the misrepresentation because it contains an explicit warning that Gulf had free rein in dealing with the FTC.
They argue, and I agree, that ง 16(c) cannot be read by any reasonable investor as a representation that Gulf was willing to divest whatever was necessary to satisfy the FTC's antitrust concerns such that that section contained a false statement if there was no such willingness. Rather, the quoted portion of ง 16(c) says merely that the parties did not "believe" the antitrust problems would be fatal. Moreover, the next sentence warns shareholders that "[t]here can be no assurance that a challenge to the Offer on antitrust grounds will not be made, or if such a challenge is made, what the result will be. See Section 15 for certain conditions to the Offer, including conditions with respect to litigation and certain governmental actions." As explained more fully in section IIA, the litigation out in ง 15 gave Gulf explicit authority to end the deal if the FTC raised antitrust concerns "regardless of the circumstances" and regardless of "any action or inaction" by Gulf. Also as explained in section IIA, pp. 728-30, ง 16(c) was not ambiguous, conveyed no information about what assets Gulf was willing to divest, and in any event is overriden by the reservation of Gulf's rights in ง 15. Nor have defendants in briefing this motion conceded that ง 16(c) contains a representation of a willingness to divest assets. See p. 729 n. 4. Accordingly, plaintiffs cannot rely on ง 16(c) as communicating defendants' allegedly false promise to divest downstream assets.[14]
Defendants challenge plaintiffs' reliance on Cities' general recommendation, and argue that the "fraud on the market" theory cannot encompass a situation where plaintiffs rely on a general recommendation which in turn is based on secret misrepresentations never intended to be released to the public. Plaintiffs concede that defendants' alleged promise to divest any downstream assets had to be kept secret, because otherwise the FTC would know what assets Gulf was willing to divest. (Moreland Aff. ถ 30) The fraud on the market theory affords plaintiffs a rebuttable presumption of reliance where public misrepresentations affect the price of shares. Basic, 108 S.Ct. at 988-992. *752 When the Supreme Court approved the fraud on the market theory, it held that " ... in order to invoke the presumption [of reliance], a plaintiff must allege and prove ... that the defendant made public misrepresentations." 108 S.Ct. at 992 n. 27 (emphasis added). Thus, defendants contend that the fraud on the market theory requires that the fraudulent misrepresentation itself be publicly disseminated, although they acknowledge that a plaintiff may recover based on a general recommendation from an investment advisor when it is induced by the publicly disseminated fraudulent misrepresentation. For example, in Panzirer v. Wolf, 663 F.2d 365, 367 (2d Cir.1981), cert. granted, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368, judgment vacated and complaint dismissed, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982) (cited with approval in Basic, 108 S.Ct. at 991 n. 25), the Second Circuit upheld, on a fraud on the market theory, a finding of reliance where the plaintiff relied on favorable mention of defendant's stock in the Wall Street Journal which had been induced by a fraudulent annual report disseminated to the public. In Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50, 53-54 (S.D.N.Y.1984), Judge Weinfeld upheld a plaintiff's reliance on a general recommendation from his father that reflected false information available in "the market." In doing so, Judge Weinfeld warned that "defendants present no evidence that the third party relied upon by plaintiff, in turn relied on factors `wholly extraneous to the market.'" 104 F.R.D. at 54 n. 8 (quoting Grossman v. Waste Mgt., Inc., 100 F.R.D. 781, 788 (N.D.Ill.1984)).
Plaintiffs cite one case where a court allowed plaintiffs to show reliance on a general public recommendation, such as Cities', even though it was induced by defendants' fraudulent misrepresentations which were never publicly disseminated. In Abelson v. Strong, [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ถ 93,365 at 96,884, 1987 WL 15872 (D.Mass. July 30, 1987), officers of AZL Resources, Inc., privately informed investment advisors at Atlantic Financial Management that a merger involving AZL was imminent. This information was false. A co-worker of plaintiff heard the rumor and recommended AZL stock to plaintiff. Although the information was transmitted privately, the court emphasized that the "purpose of the plan was to cause the share price of AZL stock to rise upon rumor of the impending merger." Id. at 96,884. In other words, unlike what plaintiffs claim happened here, defendants in Strong sought to publicize false information.
Plaintiffs claim that the rationale of these cases is not that the defendants publicly disseminated fraudulent misrepresentations, but simply that the misrepresentations and the plaintiffs' injury were connected by some causal chain. I disagree. Fundamental to every case applying the fraud on the market theory is that defendants made the fraudulent misrepresentation with the intent that the false information reach the market so as to affect the stock's price. Even though a successful plaintiff in such a case may have relied on a general recommendation from an investment advisor, that investment advisor's recommendation must have been based on information which, by private rumor or by public proclamation, was intended to reach the investing public so as to affect the market price of stock. The first element of the test endorsed in Basic for invoking the presumption of reliance is that "the defendant made public misrepresentations." 108 S.Ct. at 992 n. 27 (emphasis added). But, as conceded by plaintiffs, the alleged misrepresentations here had to be secret; otherwise, Gulf would tip its hand to the FTC. The false information which plaintiffs claim they were indirectly relying on was, in that sense, "wholly extraneous to the market." Grossman, 100 F.R.D. at 788 and cases cited therein;[15]see also Reingold v. Deloitte Haskins & Sells, 599 F.Supp. 1241, 1263 (S.D.N.Y.1984) ("courts will presume reliance only when it is logical to do so"). The fraud on the market theory itself is an extension of the reliance requirement under the securities *753 laws. That extension is rationalized by the nature of the fraud which is committed, as the name of the theory suggests, on the market as a whole, because "the market price of shares traded on well-developed markets reflects all publicly available information...." Basic, 108 S.Ct. at 991 (emphasis added). Here, the alleged misrepresentation of Gulf's willingness to divest was never intended to be made public, and never was. The most that can be said to have occurred as a result of it is that Cities was more willing to enter the deal than it would otherwise have been. The effect on the public market of that hypothesized enhancement of Cities' willingness to enter the deal is an imponderable which no fact finder could measure rationally as a basis for relief. To allow such a shadowy basis for recovery would be particularly anomalous in this case because the Offer to Purchase flatly warned shareholders that if the FTC objected to the deal, Gulf would withdraw if in its sole judgment it believed the FTC's demands threatened a material asset of Cities, regardless of Gulf's own action or inaction. In other words, if I adopt plaintiffs' theory, the shareholders could recover for the tertiary effect of a purported misrepresentation they never saw, directly negated by the Offer to Purchase, which they did see and which told them the truth. Whatever that is, it is not fraud on the market. Accordingly, plaintiffs cannot utilize the fraud on the market presumption of reliance, and, even if they could, it is rebutted by the warning in the Offer to Purchase. Thus, summary judgment is appropriate on this securities claim.
Two of the plaintiffsโFoster Bam and Milton T. Edgerton, Jr.[16]โwere Cities directors at the time of these events and thus claim that they may rely on Gulf's secret promise to divest because they heard it. They assert that they tendered their shares in reliance on Gulf's promise to divest, which they alone among plaintiffs heard and which undercut the cautionary language in the Offer to Purchase. Defendants contend that these two plaintiffs are estopped to pursue this claim because they listed in Cities' Schedule 14D-9 the only reasons for recommending the transaction as a good deal for the shareholders and Gulf's commitment to divest any downstream assets was not among them. As plaintiffs point out, however, the promise to divest any downstream assets was a reason why consummation was more likely, not a reason why the merger would benefit shareholders.[17] Moreover, as noted above, the representation was intended to be secret because the parties did not wish the FTC to hear of it. To the extent that defendants are arguing that Bam and Edgerton had a duty to disclose this material informationโthat Gulf was willing to "divest any downstream assets"โand thus were in pari dilecto, defendants' contention has more merit. See Tarasi v. Pittsburgh Nat'l Bank, 555 F.2d 1152 (3d Cir.) (affirming grant of summary judgment where "tippee" sues "tipper" for alleged misstatements), cert. denied, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); but see Mallis v. Bankers Trust Co., 615 F.2d 68, 76 & n. 6 (2d Cir.1980) (Friendly, J.) (in pari delicto defense available only where there is a "conspiratorial or quasi-conspiratorial relationship between plaintiff and defendant, relatively equal culpability as between the parties, and ... allowing the defense will further the enforcement policies of the securities acts"), cert. denied, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). The record does not disclose the extent of Bam's and Edgerton's involvement *754 and culpability in the failure to disclose these representations such that I can determine whether their culpability is equal to defendants'. Although summary judgment at this point would be inappropriate, defendants may pursue this defense at trial.

* * *
To recapitulate, plaintiffs who purchased call options have standing under both ง 10(b) and ง 14(e). Defendants' motion for summary judgment is granted as to the claim of all plaintiffs except Bam and Edgerton that defendants misrepresented in talks with Cities that they had studied the antitrust problems involved in the merger and were willing to divest any downstream assets. Defendants' motion for summary judgment is also granted on the Class plaintiffs' unsubstantiated claim that defendants had a "limited intention" to consummate the deal from the outset. Defendants' motion is granted on plaintiffs' claim that Gulf's statement of possible antitrust problems in the Offer to Purchase at ง 16(c) was reckless because it was based on inadequate analysis.[18] Defendants' motion for summary judgment on the claim that defendants failed to disclose the oil reserve shortfall and consequent "change of heart" on July 13 is denied. Only Class plaintiffs who purchased Cities call options or shares on July 30 or thereafter may press the claim that Gulf's July 30 press release was materially misleading in stating that Gulf was contesting the FTC action vigorously when it allegedly was not. Class plaintiffs may also advance claims that other post-July 13 statements were misleading because they failed to disclose the shortfall and Gulf's July 13 loss of enthusiasm. The tendering shareholder plaintiffs may use post-July 13 and pre-July 13 evidence as circumstantial support for their claim that, by July 13, Gulf had a change of heart which it should have disclosed.[19]
SO ORDERED.
NOTES
[1] "DX" denotes a defendants' exhibit submitted on this motion, "PX" a plaintiffs' exhibit.
[2] Defendants insist that Jentes was merely comparing a preliminary injunction to being tied up interminably in FTC administrative proceedings.
[3] Campbell at his deposition has expressly qualified the statement he made at that meeting that he believed that Gulf had not negotiated "in good faith." (PX 134; Morgan Dep. 610-12) Campbell testified that, "Let me say that I do not today hold the view that they negotiated in bad faith or failed to negotiate in good faith." (Campbell Dep. 348)
[4] Plaintiffs pounce on statements in defendants' briefs โ namely, that Gulf bore the risk of an FTC demand for divestiture of marketing assets only โ to claim that defendants have conceded that ง 16(c) is an ambiguous contractual term which thus requires parol evidence for clarification. (Def.'s April 14, 1989 Reply Memorandum at 145; Pltf.'s May 12, 1989 Sur-Reply Memorandum at 3-4) Defendants made no such concession, but were merely defending Gulf's decision that in its judgment the FTC's demand for the Lake Charles refinery threatened a "material portion" of Cities' assets because Gulf had expected divestiture of only gas marketing assets, not refineries.
[5] The Oklahoma case, in which Cities sued Gulf, is one of many spawned by Gulf's failed tender offer for Cities. All told there have been approximately 20 federal class suits, four state class suits, and the Wayne Investment, Inc. v. Gulf Oil Corp., 739 F.2d 11 (1st Cir.1984), lawsuit.
[6] If the contracts were combined into one contract under an integration theory, of course, ง 15's reference to "notwithstanding any other provision of the Offer" would be changed to mean "notwithstanding any other provision of the [combined agreement]." Accordingly, ง 15 would still bar any effort to incorporate "best efforts" into ง 15's "litigation out." Of course, the absurdity of combining these contracts is shown by the fact that each contract has its own clauses regarding how much freedom Gulf has in determining whether it can terminate the agreement if the FTC sought to block the merger. Compare Merger Agreement Annex I at ถ (d) "Conditions of the Offer" and ง 7.11 with Offer to Purchase at ง 15.
[7] Plaintiffs attempt to distinguish Brooks by noting that the merger agreement there had already been rescinded, a fact which "arguably barr[ed] a third party beneficiary claim even if one might otherwise have existed." (Pltf.'s March 1, 1989 Memorandum at 26) However, as Brooks noted, plaintiffs, if they were found to be intended beneficiaries, could have sought to estop the parties to the agreement from rescinding the contract without plaintiffs' consent under traditional elements of estoppel. Brooks, 564 F.Supp. at 1520; Restatement (Second) of Contracts at ง 311. Accordingly, plaintiffs' attempt to distinguish Brooks fails.
[8] Although the condition out in Annex 1 of the Merger Agreement does not contain language in ง 15 of the Offer to Purchase to the effect that the "litigation out" clause could be invoked in Gulf's "sole judgment" regardless of the circumstances and any "action or inaction" by Gulf, plaintiffs, as parties to the Offer to Purchase, are deemed to have notice of the language in ง 15 and are bound by it for purposes of promissory estoppel.
[9] The prevention doctrine is an exception to the general rule that one has no duty to perform under a contract containing a condition precedent until the condition occurs. The doctrine excuses a condition precedent when a party wrongfully prevents that condition from occurring. Ensmann, 767 F.2d at 1023. The implied good faith rule and prevention doctrine are kindred precepts:

Often courts today will decide a case on the grounds of good faith which in the past would have been decided on the basis that no man should profit by his own wrong (i.e., by defeating the reasonable expectations of others), and therefore no person can rely on the occurrence or non-occurrence of a condition when he wrongfully prevented or caused it.... Even where such actions are not `bad faith," it is still a basic principle of justice that no man should profit by his own wrong, and the rules of the common law stated in ง 767 [prevention doctrine] would continue to apply.
3A Corbin on Contracts ง 654D at 931-32 (Kaufman Supp.1989).
[10] There is thus no need here to consider the question presented in Starkman and Laventhall whether option traders suing under an insider trading theory of nondisclosure would have standing.
[11] Plaintiffs in their briefs argue also that tendering shareholders can show direct reliance on post-July 13 misrepresentations. See, infra, p. 749.
[12] Some of the other factors plaintiffs rely onโ the failed OPEC oil pricing meetings and the public criticism of the dealโwere already public knowledge such that defendants would not have had any duty to disclose them. See Richland v. Crandall, 262 F.Supp. 538, 554 (S.D.N.Y. 1967) ("corporations are not required to address ... stockholders as if they were children in kindergarten.") The evidence shows beyond dispute that the tax problem throughout the summer of 1982 was subject to rapid change; Gulf hoped Congress would attach a grandfather clause to a pending tax bill. Indeed, in mid-July, assurances from Gulf that the company would protect Cities' jobs in Tulsa seem to have mollified Congressman James Jones, one of the main congressional opponents of the grandfather clause, assuring that there would be no tax loss. (Morgan Dep. 478; Luton Dep. 508-9) Although the grandfather clause was inadvertently omitted from the tax bill on July 23, the issue still seemed alive. (PX 83) Such a mercurial situation need not have been disclosed at that time. Staffin, supra.
[13] The Class plaintiffs, at various points in their earlier briefs, have argued that, from the very inception of the merger, Gulf had only a "limited intention" of completing the deal which they failed to disclose. To the extent that they are still arguing this point, suffice it to say that plaintiffs have yet to adduce a scintilla of evidence to support it. Accordingly, summary judgment is granted on that version of the claim.
[14] Nor can plaintiffs argue that ง 16(c)'s statement about antitrust implications was made without any analysis and thus was reckless such that plaintiffs can sue directly under it even though it made "no assurance[s]" as to FTC problems. See, e.g., SEC v. R.A. Holman & Co., [1964-66 Transfer Binder] Fed.Sec.L.Rep. (CCH) ถ 91,554 at 95,093 (S.D.N.Y. July 8, 1965). Plaintiffs make much of the fact that Gulf relied primarily on a law student for its analysis of the antitrust effects of the merger. Yet the merger was effected in a couple of days leaving little time for extensive analysis, all of Gulf's lawyers at the time concurred in the law student's opinion, and Gulf later hired several noted antitrust experts who confirmed that no major antitrust problems were expected; therefore, defendants had a reasonable basis in fact for making the statements they made. As for the contention that relying on a law student for legal analysis is itself reckless, I would remind plaintiffs that they as well as this court rely on law students for basic research on major legal issues. Accordingly, there being no material factual issue suggesting that defendants "recklessly" failed to study antitrust problems, summary judgment is granted on this claim.
[15] That the Grossman decision treated class certification does not undercut its legal analysis.
[16] Defendants allege that others of the Jones plaintiffs were related or had close ties to Cities directors. (Def.'s April 14, 1989 Reply Memorandum at 248 n. 140) However, none have made any showing here by affidavits or otherwise that they heard directly Gulf's alleged promise to divest any downstream assets and, accordingly, defendants' motion for summary judgment on their claim of a securities violation here is granted as well.
[17] For the same reason, defendants' argument that Waidelich should be prevented from testifying as to the contentions in his affidavit because he caused to be disseminated the Schedule 14D-9 statement is likewise rejected. However, Waidelich's prior inconsistent statements and Schedule 14D-9 statements will no doubt make useful cross-examination material at trial. See pp. 720-21.
[18] Plaintiffs have garnished their voluminous briefs with repeated insistence that summary judgment would be inappropriate because they have not had sufficient discovery. But see Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1306-07 (9th Cir.1986) (district court did not abuse discretion in denying plaintiff's request for additional discovery and granting summary judgment where discovery sought could not lead to relevant information). Although I have denied summary judgment on some of the fraud claims and one contract breach claim, so that plaintiffs have suffered no conceivable prejudice here, plaintiffs' criticism fairly begs for response. Plaintiffs were afforded full discovery over the past year and a half. Any doubt is dispelled by a quick recapitulation of the thousands of pages of material plaintiffs have presented on this motion: (1) a 100-page affidavit by one of their lawyers marshaling the evidence; (2) 238 exhibits; (3) 43 portions of deposition testimony and affidavits; and (4) 473 pages of legal memorandum.
[19] The Jones plaintiffs' common law fraud claims are limited to Gulf's failure to disclose the shortfall and the July 13 change of heart. Only plaintiffs Bam and Edgerton may pursue the claim that defendants defrauded them by promising to divest any downstream assets. According to New York law, defendants would probably not be able to assert the defense of unclean hands. See generally Mallis, 615 F.2d at 75-76 and cases cited therein. Of course, if defendants would like to demonstrate that another state's law should apply to the common law fraud claim here such that a defense of unclean hands is possible, they may do so.